**ATLANTIS EXPRESS, INC., Appellee,**

v.

**STANDARD TRANSPORTATION SERVICES, INC., Appellant.**

**No. 91–1982.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1991.

Decided Jan. 28, 1992.

Barbara Kueppers, Minneapolis, Minn., argued, for appellant.

Thomas Wolff of Edina, Minn., argued, for appellee.

Paul H. Lamboley and Alfred S. Irving, Washington, D.C., appearing on the brief of amicus curiae Transportation Brokers Conference of America.

Before FAGG, Circuit Judge, TIMBERS,* Senior Circuit Judge, and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

Standard Transportation Services, Inc., (Standard) appeals from a judgment in favor of Atlantis Express, Inc., (Atlantis) for freight undercharges. We reverse and remand to the district court with directions to refer this matter to the Interstate Commerce Commission (ICC) pursuant to the doctrine of primary jurisdiction.

## I.

Atlantis is an ICC-licensed common and contract carrier. Standard is an ICC-licensed broker that arranges transportation

---

* THE HONORABLE WILLIAM H. TIMBERS, Senior United States Circuit Judge for the Second Circuit, sitting by designation.

services on behalf of shippers and carriers, including Atlantis. Atlantis and Standard orally agreed that for each shipment Standard arranged on behalf of Atlantis, Standard would bill the shipper for the transportation services and then would transmit to Atlantis the rate previously negotiated between Standard and Atlantis. The difference between these amounts constituted Standard's compensation for its services. Pursuant to this arrangement, Atlantis issued a freight invoice following each shipment that listed the shipper (consignor), the party receiving the goods (consignee), the rate agreed to between Standard and Atlantis, and the "bill to" party which was always Standard. Neither these freight invoices nor the bills of lading[1] ever listed Standard as the shipper or the consignee.

Between March 1987 and October 1988, Standard arranged for Atlantis to transport the goods of approximately twenty different shippers. As agreed, Standard paid Atlantis the negotiated rates for each shipment. When Atlantis later liquidated, however, an audit of the company revealed that the negotiated rate payments that Standard had transmitted to Atlantis were below the payments required by Atlantis' filed rates. Filed rates are the rates for transportation that motor common carriers publish and file with the ICC. 49 U.S.C. § 10762(a)(1) (1988). Following this audit, Atlantis sued Standard for the difference between the filed rates and the negotiated rates, known as "freight undercharges."[2]

Atlantis argues that, pursuant to 49 U.S.C. § 10761(a) (1988), Standard must pay the filed rates for the transportation services provided regardless of the fact that they negotiated lower rates. This statute provides, in part:

> Except as provided in this subtitle, a [common] carrier providing transportation or service ... shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter. That [common] carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device.

49 U.S.C. § 10761(a) (1988). The ICC and the courts historically have interpreted this statute as not permitting either a shipper's ignorance or a carrier's misquotation of the applicable rate to serve as a defense to a common carrier's collection of the filed rate. This practice has become commonly known as the "filed rate doctrine." The Supreme Court recently reinvigorated this doctrine by overturning the ICC's *Negotiated Rates* policy of relieving the shipper of the obligation to pay the filed rate when the shipper and the common carrier had negotiated a lower rate. *Maislin Indus., U.S. v. Primary Steel, Inc.,* — U.S. —, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). The Court reasoned that the ICC's practice of allowing shippers to avoid the filed rate whenever they had negotiated another rate was flatly inconsistent with the purpose of the Interstate Commerce Act[3] to forbid as discriminatory the secret negotiation and collection of rates lower than the filed rate.[4] *Id.,* 110 S.Ct. at 2768; *see also* 49

---

1. The bill of lading is the basic transportation contract between the shipper (consignor) and the carrier. An ICC regulation requires each bill of lading to contain the names of consignor and consignee, the origin and destination points, and a description of the freight. 49 C.F.R. § 1051.1. The terms and conditions of the bill of lading bind the shipper and each connecting carrier, with each term having the force of a statute. *Southern Pac. Transp. Co. v. Commercial Metals Co.,* 456 U.S. 336, 342–43, 102 S.Ct. 1815, 1820–21, 72 L.Ed.2d 114 (1982). Common carriers must issue a receipt or bill of lading for property tendered for transportation. 49 U.S.C. § 11707(a)(1) (1988).

2. Atlantis did not sue any of the shippers for the freight undercharges. Presumably, Atlantis thought it would be easier to bring one suit against the broker than a separate suit against each shipper.

3. This opinion generally refers to the provisions currently codified at 49 U.S.C. §§ 10101–11917 (1988) as the Interstate Commerce Act (ICA).

4. Prior to the *Maislin* decision, the circuits were split on whether the ICC's *Negotiated Rates* policy was consistent with the ICA. *Compare Supreme Beef Processors, Inc. v. Yaquinto (In re*

U.S.C. § 10101(a)(1)(D) (1988). According to Atlantis, the "filed rate doctrine," as reaffirmed in *Maislin,* requires Standard to pay the filed rate.

Standard, on the other hand, argues that the filed rate doctrine does not control the issue before this court. Specifically, Standard argues that: (1) the filed rate doctrine does not apply because Atlantis transported the shipments as a contract carrier rather than as a common carrier; (2) a broker, as opposed to a shipper, is not liable for freight undercharges; and (3) assuming Standard is liable for the freight undercharges, the issue of whether the filed rates were reasonable should be referred to the ICC for determination.

The district court rejected all of Standard's arguments. *Atlantis Express, Inc. v. Unicorn Transp. Sys.,* 764 F.Supp. 135 (D.Minn.1991). The court found that Atlantis could not have been acting as a contract carrier because Standard and Atlantis had not entered into a written agreement as required by ICC regulations. *Id.* at 138 n. 3. The court also found that, although Standard was a broker, it assumed the shippers' primary liability for the filed rates by billing and collecting freight charges. Additionally, the court held that Standard could not avoid the filed rate doctrine by claiming that the undercharges were compensation for its services. *Id.* at 138. Finally, the court refused to refer the issue of rate reasonableness to the ICC because the request for referral was untimely and supported by insufficient evidence. *Id.* at 139. Accordingly, the court granted Atlantis summary judgment for the amount of the undercharges plus prejudgment interest.

We review a grant of summary judgment de novo. Summary judgment is proper only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Because we find the relevant law and how that law applies to the facts of this case unclear, we cannot conclude that Standard is entitled to judgment as a matter of law or that there are no genuine issues of fact.[5] Rather, we believe that, under the doctrine of primary jurisdiction, this matter should be referred to the ICC. Although the parties did not request that we refer all the issues involved in this dispute to the ICC, it is well established that the doctrine of primary jurisdiction is not waived by the failure of the parties to present it in the trial court or on appeal. *E.g., Red Lake Band of Chippewa Indians v. Barlow,* 846 F.2d 474, 476 (8th Cir.1988).

"Primary jurisdiction ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body...." *United States v. Western Pac. R.R.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–165, 1 L.Ed.2d 126 (1956). There is no fixed formula for applying the doctrine of primary jurisdiction. "In every case the question is whether the reasons for the existence of the doctrine are present...." *Id.* at 64, 77 S.Ct. at 165. These reasons include promotion of uniformity in statutory and regulatory construction, and utilization of the agency's specialized knowledge. *E.g., id.* Additionally, application of the doctrine is

*Caravan Refrig. Cargo, Inc.),* 864 F.2d 388 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3254, 111 L.Ed.2d 763 (1990) (finding that *Negotiated Rates* policy violated ICA) *with Delta Traffic Serv. v. Transtop, Inc.,* 902 F.2d 101 (1st Cir.1990) (upholding *Negotiated Rates* policy); *Orscheln Bros. Truck Lines, Inc. v. Zenith Elec. Corp.,* 899 F.2d 642 (7th Cir.1990); *West Coast Truck Lines, Inc. v. Weyerhaeuser Co.,* 893 F.2d 1016, withdrawn on rehearing, 912 F.2d 1130 (9th Cir.1990); *Delta Traffic Serv. & Oneida Motor Freight, Inc. v. Appco Paper & Plastics*

*Corp.,* 893 F.2d 472 (2d Cir.1990); *Maislin Indus. v. Primary Steel, Inc.,* 879 F.2d 400 (8th Cir. 1989); *cf. Ets–Hokin & Galvan, Inc. v. Maas Transp., Inc.,* 380 F.2d 258 (8th Cir.1967) (enforcing the negotiated rate when there was no filed rate).

**5.** *Maislin* is not dispositive of this case because Standard raises defenses that were not addressed in *Maislin.*

appropriate when policy considerations are at issue. *Clark Oil Co. v. Texaco Inc.,* 609 F.Supp. 1373, 1381 (D.Del.1985). Because this case raises many issues, we set out below the issues we are referring to the ICC and why we believe it is proper for the ICC to address them first.

## II.

### A. Common Carrier versus Contract Carrier

The ICC, through exercise of its statutory authority,[6] has exempted motor contract carriers from the requirements of the filed rate doctrine. *Exemption of Motor Contract Carriers from Tariff Filing Requirements,* 133 M.C.C. 150 (1983), *aff'd sub nom. Central & S. Motor Freight Tariff Ass'n v. United States,* 757 F.2d 301 (D.C.Cir.), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). Accordingly, if Atlantis provided the transportation services arranged by Standard pursuant to its contract carrier authority rather than its common carrier authority,[7] it is not entitled to its filed rates.

The Act defines "motor contract carrier" as:

a person providing motor vehicle transportation of property for compensation under *continuing agreements* with one or more persons—

(i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or

(ii) designed to meet the distinct needs of each such person.

49 U.S.C. § 10102(15)(B) (1988) (emphasis added). The ICC has enacted a regulation defining "continuing agreements:"

No contract carrier by motor vehicle, as defined in 49 U.S.C. [§] 10102(15) shall transport property for hire ... except

under special and individual contracts or agreements which *shall be in writing,* shall provide for transportation for a particular shipper or shippers, shall be bilateral and impose specific obligations upon both carrier and shipper or shippers, shall cover a series of shipments during a stated period of time in contrast to contracts of carriage governing individual shipments....

49 C.F.R. § 1053.1 (1990) (emphasis added). The ICC permit granting Atlantis contract carrier authority provides that "[t]his authority will be effective as long as the carrier maintains compliance with the requirements pertaining to ... the execution of contracts (49 CFR 1053)...." Appellant's App. at 19 (parenthetical in original).

This permit and the ICC regulations to which it refers facially require Atlantis to enter a written contract with a "shipper"[8] before it can act pursuant to its contract carrier authority. It is undisputed that Standard and Atlantis did not execute a written contract. Standard, however, argues that failure to comply with this written contract requirement is only a technical violation that does not convert contract carriage to common carriage. According to Standard, contract carriage exists if property is transported pursuant to a binding agreement that satisfies the statutory definition of contract carriage. Standard also claims that Atlantis and Standard had a continuing oral agreement that satisfied the statutory definition.

Standard's argument that contract carriage can exist absent a written contract relies on the ICC's recent statement that "[t]he Commission does not 'invalidate' contracts for contract carriage, and it is not our policy to find a lack of contract carriage based on simple, technical oversights or omissions." ICC, Ex Parte No. MC–198,

---

**6.** The Interstate Commerce Act provides:
The Commission may grant relief from [the filed tariff requirements] to contract carriers when relief is consistent with the public interest and the transportation policy....
49 U.S.C. §§ 10761(b), 10762(f) (1988).

**7.** Atlantis was licensed by the ICC as both a motor contract carrier and a motor common carrier.

**8.** Another ICC regulation requires that contracts for contract carriage be between the carrier and a particular shipper or shippers. 49 C.F.R. § 1053.3 (1990). Standard argues that the definition of "shippers" is broad enough to include some brokers.

*Contracts for Transp. of Property* 5 (Feb. 20, 1991). What the ICC means by this statement is not clear. Certainly, such an ambiguous statement does not allow this court to ignore past ICC decisions that have consistently required a written contract, and find that contract carriage existed.[9] *See, e.g.,* ICC, No. 40342, *Diversey Wynadotte Corp.—Petition for Declaratory Order—Certain Rates and Practices of Campbell 66 Express, Inc.* 4 (June 4, 1990) ("Contract carriage, by definition, requires the existence of a written bilateral contract or contracts between the parties."); ICC, Ex Parte No. MC–198, *Contracts for Transp. of Property,* 1991 WL 188244, at *6 (Aug. 27, 1991) ("The threshold requirement [for contract carriage] imposed by the Commission in the current regulations is a formal written contract."). Likewise, we doubt that the ICC could simply ignore its regulations and look only to the statutory definition of contract carriage. This statement, however, is sufficiently ambiguous to justify referring to the ICC the issue of whether Atlantis transported the disputed shipments pursuant to its contract carrier authority.[10] In resolving this issue, we hope that the ICC will articulate an explanation for its action that clarifies the above statement. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

### B. Broker Liability and Broker Commissions

Assuming Atlantis acted as a common carrier, Standard asserts that, as a broker, it is not liable for any of the freight charges. We agree that the ICA does not generally make brokers liable for freight charges. 49 U.S.C. § 10744 (making only shippers (consignors) and, in some situations, consignees liable for freight charges).[11] Additionally, we recognize that if Standard became liable for only the negotiated rate, it has satisfied this liability. Thus, the issue is whether there is some basis for finding Standard liable for more than the negotiated rate, i.e., either the amount it received from the shippers or the filed rate.[12]

One potential basis for liability is the following ICC regulation:

Where the broker acts on behalf of a person bound by law or a Commission regulation as to the transmittal of bills or payments, the broker must also abide by the law or regulations which apply to that person.

49 C.F.R. § 1045.10 (1990). Atlantis argues that because Standard acted on behalf of shippers, who are liable for freight charges, this regulation makes Standard also liable. We find this regulation ambiguous. Arguably, it makes a broker liable for the entire filed rate when it acts on behalf of a shipper. *See Sovran Bank/Southeast v. ICB Transp. Servs.,* 1990 Fed.Car.Cas. (CCH) ¶ 83,569, at 58,-242–43, 1990 WL 311594 (E.D.Tenn. July 13, 1990) (relying on this regulation to hold that a broker assumes liability for the filed rate when it bills and collects freight

**9.** The ICC is currently in the process of repealing its regulations regarding contract carriage. ICC, Ex Parte No. MC–198, *Contracts for Transp. of Property,* 1991 WL 188244 (Aug. 27, 1991). Until repealed, however, the regulations continue to have the force of law unless they are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1988); *see also, e.g., Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). We do not view the ICC's written contract requirement as such.

**10.** In light of this statement, we believe that Standard has made a sufficient threshold showing of contract carriage to justify referral. *Cf.,*

*e.g., Overland Express, Inc. v. Int'l Multifoods,* 765 F.Supp. 1386, 1387–88 (S.D.Ind.1990) (requiring a threshold showing that rates are unreasonable before referring the issue of rate reasonableness to the ICC). Standard has introduced uncontradicted affidavit testimony that Atlantis provided special services for the shipments Standard arranged, that the parties operated under a continuing oral agreement for several years, and that the parties agreed that Atlantis' services would be pursuant to its contract carrier authority. Appellant's App. at 13–15.

**11.** There is no evidence that Standard acted as either a consignor or a consignee.

**12.** The district court found that Standard was liable for the filed rate.

charges). Alternatively, it makes a broker liable only for those funds it receives from the shipper. A third interpretation is that it imposes no liability at all. *Bankruptcy Estate of United Shipping Co. v. Tucker Co.*, 474 N.W.2d 835, 840–41 n. 2 (Minn.Ct. App.1991) (finding that this regulation does not make a broker liable for unpaid freight charges).

A second potential basis for liability is that Standard assumed liability for the negotiated rate, and once a broker assumes liability for the negotiated rate, it becomes liable for the filed rate. *See, e.g., Sovran Bank/Southeast,* 1990 Fed.Car.Cas. (CCH) ¶ 83,569, at 58,242–43. This basis for liability raises two sub-issues: what evidence is sufficient to find that a broker assumed liability for the negotiated rate;[13] and, does either the filed rate doctrine or the above ICC regulation impose liability for the filed rate once the broker assumes liability for the negotiated rate.

Assuming Standard became liable for either the amount it received from the shippers or the filed rate, the question becomes whether a common carrier can pay a broker commission, and, if so, whether a broker can legally deduct the commission before transmitting the shipper's payment to the carrier. In 1980, the ICC stated that, except in limited circumstances, ICC regulations allow a broker to charge a carrier a commission. Property Broker Practices, 45 Fed.Reg. 31,140, 31,141 (1980). Since the Supreme Court's reaffirmation of the filed rate doctrine in *Maislin,* however, the ICC has not addressed whether a common carrier can pay a broker a commission without violating the filed rate doctrine. Assuming that Standard can validly deduct a commission and is liable for the filed rate, the additional question arises of whether Stan-

dard's commission is the difference between the amount it received from the shipper and the negotiated rate or the difference between the filed rate and the negotiated rate.

As the above discussion makes clear, the numerous issues relating to broker liability and the payment of commissions are complex. Their resolution requires the interpretation of an ambiguous regulation and expert knowledge on the functioning of broker-carrier arrangements. Additionally, the current lack of any clear ICC statement on these issues can result in inconsistent judicial resolution, as case law already demonstrates. Finally, because resolution of these issues could impact the future viability of transportation brokers, the administrative agency charged with the implementation of transportation policy should address them first. Br. of Transp. Brokers Conf. of Am. at 16–17 (amicus curiae brief in support of appellant). Accordingly, under the doctrine of primary jurisdiction, we remand to the district court with directions to refer to the ICC the issues of whether Standard became liable for the freight charges and, if so, what is the current amount of this liability.

### C. Rate Reasonableness

Standard's final claim is that, assuming it is liable for freight undercharges, Atlantis' filed rates are unreasonable. On appeal, Standard argues that because this issue is within the ICC's primary jurisdiction, the district court erred in not referring it to the ICC. The Supreme Court has recognized that "the filed rate is not enforceable if the ICC finds the rate to be unreasonable." *Maislin Indus., U.S.,* 110 S.Ct. at 2767. Additionally, there is an express statutory provision giving shippers

---

**13.** The district court found that Standard had agreed to assume liability because it was the "bill to" party on the freight invoices and actually paid the bills. *Atlantis Express, Inc.,* 764 F.Supp. at 138. We question whether this indicates an assumption of liability by the broker, or if it is common for brokers to act as intermediaries without assuming personal liability. Case law is inconsistent on this issue. *Compare, e.g., id. with Motor Carrier Audit & Collection Co. v. Freight Line, Inc.,* No. CA3–87–2503–

R, slip op. at 3, 1988 WL 236363 (N.D.Tex. June 9, 1988) (finding "no evidence" that the broker agreed to pay the freight charges even though the broker's statement of facts expressly notes that the broker paid the carrier and then collected from the shipper. Appellant's App. at 52–53) *and United Shipping Co.,* 474 N.W.2d at 841 ("Mere transmittal of payment from a shipper to a carrier by itself is insufficient evidence of a broker's acceptance of primary responsibility for unpaid transportation charges.").

(and brokers) the right of reparations against carriers that charge unreasonable rates. 49 U.S.C. §§ 11705(b)(3), 11706(c)(2). The circuits, however, are split on whether the unreasonableness of filed rates can constitute a defense in an action to collect freight undercharges. The majority of circuits have held that rate unreasonableness is a valid defense. *Rebel Motor Freight, Inc. v. ICC*, No. 89–3886, 1991 WL 88354, at *3 [933 F.2d 1009 (Table)] (6th Cir. May 28, 1991) (per curiam), *cert. denied*, —— U.S. ——, 112 S.Ct. 617, 116 L.Ed.2d 638 (1991); *Delta Traffic Serv. v. Transtop, Inc.*, 902 F.2d 101, 104–06 (1st Cir.1990); *Western Transp. Co. v. Wilson and Co.*, 682 F.2d 1227, 1231–32 (7th Cir.1982); *cf. Duffy v. BMC Indus.*, 938 F.2d 353, 357 (2d Cir.1991) (allowing shipper to assert an unreasonableness defense when two-year statute of limitations on reparations action had expired); *Delta Traffic Serv. v. Georgia–Pacific Corp.*, 936 F.2d 64, 66 (2d Cir. 1991) (denying ICC referral of rate unreasonableness because of failure to raise issue in lower court, but directing the district court to hold the undercharge payments until the shipper's separate reparations action could be resolved); *Branch Motor Express Co. v. Caloric Corp.*, No. 89–1130, slip op. at 3–4 [914 F.2d 241 (Table)] (3d Cir. Aug. 14, 1990) (mem.) (implicitly recognizing an unreasonableness defense, but denying ICC referral because the shipper failed to introduce any evidence of unreasonableness). Only the Fourth and Fifth Circuits have held that shippers (or brokers) must pay the freight undercharges and then raise the reasonableness of the filed rates in a separate reparations action before the ICC. *Cooper v. Delaware Valley Shippers (In re Carolina Motor Express, Inc.)*, 949 F.2d 107, 110 (4th Cir.1991) (2–1 decision); *Supreme Beef Processors, Inc. v. Yaquinto (In re Caravan Refrig. Cargo, Inc.)*, 864 F.2d 388, 389–93 (5th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3254, 111 L.Ed.2d 763 (1990).

■■■ Although this circuit has not yet addressed the issue, numerous Eighth Circuit district courts have found rate unreasonableness to be a valid defense. *See Zurek Express, Inc. v. Intermetro Indus.*, 775 F.Supp. 1215, 1216 (D.Minn.1991) (Devitt, J.); *Bergquist v. Twin Modal (In re Sharm Express, Inc.)*, No. 4–91–32, slip op. at 2, 1991 WL 156573 (D.Minn. Aug. 7, 1991) (Rosenbaum, J.); *Bergquist v. 7/24 Freight Sales, Inc. (In re Sharm Express, Inc.)*, 122 B.R. 999, 1004 (D.Minn.1991) (MacLaughlin, J.); *Gale v. Norwesco, Inc.*, No. 4–90–156, slip op. at 8–10, 1990 WL 284504 (D.Minn. Dec. 11, 1990) (Doty, J.); *Maislin Indus., N.A. v. Primary Steel, Inc.*, No. 85–0021–CV–W–JWO–5, 1990 WL 264536, at *2 (W.D.Mo. Nov. 21, 1990) (Wright, J.); *cf. Bergquist v. LaSalle–Deitch Co. (In re Sharm Express, Inc.)*, 127 B.R. 620, 624–25 & n. 3 (D.Minn.1991) (Murphy, J.) (implicitly recognizing unreasonableness as a defense, but denying ICC referral on other grounds). We consider this outcome to be the better reasoned approach, and thus adopt the majority view. We limit our holding, however, to those situations where the parties agreed to a negotiated rate and the shipper (or broker) no longer has an adequate reparations remedy at the time it is billed for the undercharges. We reserve the issue of whether rate unreasonableness is a defense in all actions to collect filed rates for a case that requires us to address this issue.

The ICA does not expressly address the availability of a rate unreasonableness defense. The ICC, however, has recently issued an opinion concluding that rate unreasonableness is a defense in cases such as this. Specifically, the ICC stated: "Immediate payment is not needed to achieve the goals of the filed rate doctrine.... There is no possibility of a defunct carrier unlawfully discriminating for or against any shippers while the rate reasonableness challenge is being resolved." ICC, Ex Parte No. MC–177 (Sub–No. 2), *Petitions for Issuance of Rate Reasonableness and Unreasonable Practices Policy Statement*, 8 I.C.C.2d 61, 68 (Aug. 15, 1991). The ICC also stated that when the carrier is unable to satisfy a reparation order, "enforcement of the filed tariff without referral to the ICC would undermine the meaningful exercise of our unreasonable-rate jurisdiction and would deny the shipper an adequate

remedy." *Id.* at 67. Because Standard was not billed for the undercharges until after Atlantis, a corporation, had liquidated, Standard would have no remedy if it were unable to raise an unreasonableness defense. Thus, this court should allow Standard to assert an unreasonableness defense unless we find the ICC's construction of the ICA unreasonable. *Chevron U.S.A. Inc.*, 467 U.S. at 843, 104 S.Ct. at 2782 (this court's role is limited to determining "whether the agency's answer is based on a permissible construction of the statute"). In light of the ICA's requirement that filed rates be reasonable, 49 U.S.C. § 10701(a) (1988), and the express reparations remedy, 49 U.S.C. § 11705(b)(3) (1988), we find it reasonable to conclude that the filed rate doctrine, and the ICA generally, do not give carriers the right to collect an unreasonable rate from shippers (or brokers) who cannot recover reparations in a separate action.

Contrary to the Fourth and Fifth Circuits, we do not believe that Supreme Court precedent mandates a contrary conclusion.[14] Although *T.I.M.E. Inc. v. United States*, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959), prohibited an unreasonableness defense, a subsequent congressional enactment, Act of Sept. 6, 1965, Pub.L. No. 89–170, §§ 6–7, 79 Stat. 651–52 (codified at 49 U.S.C. §§ 11705(b)(3), 11706(c)(2) (1988)), repudiated the basis for this decision.[15] *Maislin Indus., U.S.*, 110 S.Ct. at 2776–77 n. 12 (Stevens, J., dissenting). Additionally, unlike the ICC policy overturned in *Maislin, id.* at 2769, the ability to challenge the reasonableness of filed rates in an action to collect rate undercharges does not render nugatory the filed rate doctrine. Only if the ICC were to find a filed rate unreasonable simply because the

carrier had negotiated a lower rate would the filed rate doctrine be undermined. We will not assume the ICC will take such action on referral. Accordingly, because Supreme Court precedent does not prohibit a rate unreasonableness defense, we will defer to the ICC's conclusion that such a defense exists in cases such as this.

It is well established that the ICC has primary jurisdiction to determine whether filed rates are reasonable. *See, e.g., Western Pac. R.R.*, 352 U.S. at 62–70, 77 S.Ct. at 164–168. If the conclusory assertion of rate unreasonableness required referral to the ICC, however, unjustified delays could occur. Accordingly, to justify referral, parties must make a threshold showing that the ICC could find the filed rates unreasonable. *E.g., Branch Motor Express Co.*, No. 89–1130, slip op. at 4 (the "mere mention of rate unreasonableness, entirely unsupported even now, is not sufficient" to justify referral to the ICC). We consider the ICC's criteria for determining reasonableness to be highly probative of what evidence supports referral.

In a recent opinion, the ICC stated that relevant factors include whether the filed rate would have moved the traffic, and how the carrier's rates compare with competitively set rates for the same traffic—especially those rates offered by healthy (non-bankrupt) carriers. ICC, Ex Parte No. MC–177 (Sub–No. 2), *Petitions for Issuance of Rate Reasonableness and Unreasonable Practices Policy Statement*, 8 I.C.C.2d 61, 74–76 (Aug. 15, 1991); *see also* 49 U.S.C. § 10701(e) (1988). This is the type of evidence introduced by Standard. Standard submitted an extensive comparison of rates between Atlantis and other "healthy" carriers that offered the same or

**14.** In our opinion, the First Circuit correctly recognized that the Supreme Court cases relied on by the Fifth Circuit did not address the issue of whether rate unreasonableness is a valid defense in undercharge actions. *See Delta Traffic Serv.*, 902 F.2d at 105–06. Arguably, Supreme Court precedent even supports a finding that unreasonableness is a defense. *See Western Pac. R.R.*, 352 U.S. at 71–74, 77 S.Ct. at 168–171 (finding that rate unreasonableness is a defense in an action to collect rail freight undercharges); *Maislin Indus., U.S.*, 110 S.Ct. at 2765 n. 8,

2767 n. 10 (remanding to the district court the issue of rate reasonableness with full knowledge of the existing circuit split).

**15.** The *T.I.M.E.* court relied on the nonexistence of a statutory reparations action in concluding that unreasonableness was not a defense. 359 U.S. at 470–80, 79 S.Ct. at 908–14. Thus, when Congress amended the ICA to create such an action, the basis for the *T.I.M.E.* holding was no longer valid.

similar services in the same territory during the same time period. Appellant's App. at 15–16, 29–43. These comparisons showed that Atlantis' negotiated rates were consistent with the market rates prevailing at the time, and that its filed rates were above the market rate. This evidence falls directly within the ICC criteria for determining unreasonableness. Contrary to the district court, we consider this evidence sufficient to justify referral to the ICC. *See Overland Express, Inc.*, 765 F.Supp. at 1388 (referring rate reasonableness to ICC on almost identical evidence).

We also disagree with the district court's finding that Standard's request for referral was untimely. Standard timely raised the defense of rate unreasonableness in its answer, Fed.R.Civ.P. 8(c), 12(b), and introduced sufficient evidence in support of this defense to justify referral to the ICC.[16] The district court thus should have referred the matter to the ICC regardless of when, or even if, Standard brought a motion for referral. The ICC's primary jurisdiction over this issue cannot be waived. *Red Lake Band of Chippewa Indians*, 846 F.2d at 476. Accordingly, we remand the issue of rate unreasonableness to the district court with directions to refer the matter to the ICC.

### III.

In sum, pursuant to the doctrine of primary jurisdiction, we reverse and remand to the district court with directions to refer the following issues to the ICC: (1) whether Atlantis transported the disputed shipments pursuant to its contract carrier authority; (2) whether Standard, as a broker, became liable for any of the freight charges and, if so, what is Standard's current liability; and (3) whether Atlantis' filed rates for the disputed shipments were unreasonable.

---

**16.** Although Standard failed to introduce evidence supporting its unreasonableness defense until after the nondispositive motion deadline, we do not believe that this deadline foreclosed a later introduction of supporting evidence. Evidence of rate unreasonableness goes to the merits of the action. *See Delta Traffic Serv. v. Occidental Chem. Corp.*, 846 F.2d 911, 914 (3d Cir.1988).