**MILNE TRUCK LINES, INC. and Consolidated/Mark, a Joint Venture Between Consolidated International Stores Corp. and Mark Services, Inc., Plaintiffs–Appellees,**

v.

**MAKITA U.S.A., INC., Defendant–Appellant.**

No. 91–55059.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 3, 1991.

Decided July 7, 1992.

Mary Kay Reynolds, Kroll & Tract, Los Angeles, Cal., for defendant-appellant.

Miles L. Kavaller, Beverly Hills, Cal., for plaintiffs-appellees.

Before BROWNING, BOOCHEVER, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

The primary question presented by this case is whether in a suit brought by a motor common carrier under the Interstate Commerce Act for recovery of its filed rate the defendant shipper may plead unreasonableness of the filed rate as a defense. We conclude that the filed rate doctrine, as set forth in *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), does not bar such a defense, but that because the reasonableness of a motor common carrier filed rate falls within the primary jurisdiction of the Interstate Commerce Commission (ICC), the district court must refer the reasonableness issue to the ICC for initial determination. We further conclude that the filed rate doctrine does bar the assertion of common law counterclaims for negligent or fraudulent conduct relating to the negotiation and filing of tariff rates. Accordingly, we reverse the district court's grant of partial summary judgment to the carrier, Milne Truck Lines, but affirm its dismissal of defendant-appellant Makita, U.S.A.'s counterclaims for negligence and fraud.

I

Appellee Milne Truck Lines, Inc. (Milne), was a motor common carrier operating in interstate commerce pursuant to a grant of authority issued by the Interstate Commerce Commission (ICC). Appellant Makita U.S.A., Inc. (Makita), a manufacturer of electric power tools, used the transportation services of Milne to ship its products. On all shipments after June 24, 1985, Milne billed Makita at a 35% discount from its generally applicable filed rate. The freight

bills incurred by Makita from July 11, 1985, through March 23, 1987, for shipments originating from Fremont, California, and Cerritos, California, are the subject of this dispute.

Until mid–1985, Makita's headquarters were located in its facility in San Jose, California. In late 1984, Milne filed a tariff with the ICC that reflected a 25% discount for Makita shipments originating from San Jose, effective December 18, 1984. On June 13, 1985, Makita moved its headquarters from San Jose to Fremont, and at that time ceased operating out of San Jose. At no time after June 13 did Milne transport Makita shipments originating from San Jose. Effective June 24, 1985, Milne amended its filed tariff to increase the discount for Makita shipments originating *in San Jose* to 35%. Not until August 18, 1987, did Milne amend its filed tariff to provide expressly for a 35% discount for Makita shipments originating in Fremont.

Milne ceased operations on September 10, 1987. Appellee Consolidated/Mark (C/M), a freight audit company, was appointed to audit Milne's freight bills in order to determine whether the bills had been paid and whether they had been properly rated according to the tariffs filed by Milne with the ICC. When C/M discovered that from July 11, 1985, through March 23, 1987, Makita had paid the discounted rate on shipments originating from Fremont and Cerritos, C/M demanded payment of the filed, nondiscounted rate. Until C/M supplied Makita with a copy of the tariff filed by Milne, Makita was not aware that the tariff specified a discount rate only for shipments originating in San Jose. Makita refused to make the additional payments.

C/M filed suit against Makita under the Interstate Commerce Act (the Act), 49 U.S.C. §§ 10761, 10762, for payment of the filed rate. Makita raised twenty-one affirmative defenses. Makita claimed, *inter alia*, that the tariff was ambiguous, that the nondiscounted filed rate was unreasonable, that the question of the reasonableness of the filed rate fell within the primary jurisdiction of the ICC, and that Milne's tariff and billing practices consti-

tuted unreasonable practices under 49 U.S.C. §§ 10701 and 10704. In addition, Makita filed three counterclaims against Milne. The first two counterclaims sought damages based on Milne's allegedly negligent or fraudulent conduct in representing to Makita that the rates it offered had been or would be filed and in failing to file tariffs that corresponded to the agreement negotiated with Makita. The third counterclaim alleged the imposition of unreasonable rates in violation of 49 U.S.C. § 10701(a).

C/M and Milne filed motions to dismiss Makita's counterclaims and for partial summary judgment, and Makita filed a motion for referral of the issues of the reasonableness of Milne's tariff rates and practices to the ICC. On March 28, 1989, the district court stayed its action on the various motions pending our decision in *West Coast Truck Lines, Inc. v. Weyerhaeuser Co.*, 893 F.2d 1016 (9th Cir.), *withdrawn*, 912 F.2d 1130 (9th Cir.1990), on the question whether under the Act an unreasonable practice defense could be asserted to prevent application of the filed rate doctrine in an action to collect for motor common carrier undercharges. During the stay, Makita filed a petition with the ICC for review of Milne's tariff rates and practices. The ICC set a briefing schedule, which was filed with the district court.

Our opinion in *West Coast Truck Lines*, filed January 4, 1990, concluded that the ICC's recognition of an unreasonable practice defense to the filed rate doctrine was consistent with congressional intent. Makita filed a motion in the district court for judicial notice of the decision in *West Coast Truck Lines*, and of the fact that the Supreme Court had granted certiorari in order to resolve the identical issue. On June 21, 1990, the Supreme Court issued its decision in *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), which effectively reversed *West Coast Truck Lines.*

Shortly after the Court's decision in *Maislin*, C/M and Milne requested that the district court lift the stay and rule on the pending motions. The district court re-

fused to refer the reasonable rate issue (as well as the reasonable practice question), granted plaintiffs' motions for dismissal of Makita's counterclaims and for partial summary judgment, and entered judgment for Milne in the amount of $47,653.10. The court also awarded Milne prejudgment interest. Makita filed this timely appeal.[1]

## II

Makita argues that the tariff language specifying "San Jose" as the point of origin for Makita shipments entitled to the discounted rate is ambiguous because Milne amended the tariff to increase the discount *after* Makita had ceased operating out of San Jose. Thus, a literal reading of "San Jose" would render the amended tariff meaningless. Accordingly, Makita argues, we are required to construe "San Jose" to include shipments from Fremont and Cerritos. We find that the tariff reference to "San Jose" is ambiguous with respect to shipments originating in Fremont, but not with respect to shipments originating in Cerritos. Because we are unable on the present record to identify the interpretation of the tariff that best effectuates the intent of the parties, we remand to allow the district court to do so.

■ The construction of a tariff, including the threshold question of ambiguity, ordinarily presents a question of law for the court to resolve. *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 66, 77 S.Ct. 161, 166, 1 L.Ed.2d 126 (1956); *Union Pac. R.R. v. Ore–Ida Potato Products*, 252 F.2d 505, 507 n. 5 (9th Cir.1958). Because a tariff is considered to be a contract between the carrier and the shipper, general principles of contract law apply. *Western Transp. Co. v. Wilson & Co.*, 682 F.2d 1227, 1231 (7th Cir.1982). Accordingly, once a court determines that a term or phrase used in a tariff is ambiguous, the court may in most instances proceed to

issue a definitive interpretation of that term or phrase.

■ Upon occasion, the interpretation of an ambiguous term or phrase requires specialized administrative knowledge. Broadly speaking, the doctrine of primary jurisdiction requires that disputes regarding tariff construction be referred to the ICC if interpretation of the disputed term or phrase implicates larger issues of transportation policy that demand uniform administration by an expert body. *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 778 F.2d 1365, 1370 (9th Cir.1985) (citing *Western Pac. R.R.*, 352 U.S. at 65, 77 S.Ct. at 165). "[W]here words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that 'the enquiry is essentially one of fact and of discretion in technical matters,' then the issue of tariff application must first go to the Commission." *Western Pac. R.R.*, 352 U.S. at 66, 77 S.Ct. at 166 (quoting *Great N. Ry. Co. v. Merchants Elevator Co.*, 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922)). The doctrine does not apply, however, "if the tariff's language is used in its ordinary sense." *Farley Transp. Co.*, 778 F.2d at 1370 (citing *United States v. Yellow Freight Sys., Inc.*, 762 F.2d 737, 740 (9th Cir.1985)).

■ Turning now to the particular matter before us, we consider first whether the tariff reference to "San Jose" is ambiguous. Makita relies on *Carrier Service, Inc. v. Boise Cascade Corp.*, 795 F.2d 640 (8th Cir.1986), in which the Eighth Circuit upheld a district court's finding that a tariff reference to "St. Louis" was ambiguous. The carrier, Delta Motor Freight, Inc., had filed a tariff granting Boise Cascade a favorable rate for shipments to and from "St. Louis, Missouri." In fact, Boise Cascade had no facilities within the municipal boundaries of the City of St. Louis, but had three facilities in outlying communities

---

1. The ICC also stayed its proceedings on Makita's petition pending the Court's decision in *Maislin.* Those proceedings were reinstated on March 15, 1991. The ICC has determined that it has jurisdiction to consider the reasonableness of Milne's tariff rates and practices even absent a referral from the district court. *Makita U.S.A., Inc.,* No. MC–C–30164, 1991 WL 172716 (I.C.C. Sept. 6, 1991).

located within the commercial area of St. Louis/East St. Louis as defined by 49 C.F.R. § 1048.11, 1048.101. *Id.* at 642. The court agreed that under those circumstances the tariff reference to "St. Louis, Missouri" was ambiguous. *Id.* It further agreed that because a literal reading of the tariff to apply only to facilities located within the City of St. Louis would lead to an absurd result, "St. Louis" should be read to refer to the larger commercial area. *Id.*

As to Makita's facility in Fremont, many of the same arguments that supported a finding of ambiguity in *Boise Cascade* exist here. The term "San Jose" could refer to the City of San Jose; to the greater San Jose metropolitan area, which does not include Fremont; or to Makita's facility in the San Francisco Bay area.[2] When the amendment to the tariff took effect, Makita had no facilities in the City of San Jose. The only one in the region that includes San Jose was in Fremont. We conclude, therefore, that the tariff reference to "San Jose" is ambiguous with respect to the Fremont facility.

■ By no stretch of the imagination, however, could the term "San Jose" include Cerritos, a community located near Los Angeles, some 300 miles south of San Jose. " '[C]laimed ambiguities or doubts as to the meaning of a rate tariff must have a substantial basis in light of the ordinary meaning of the words used....' " *Union Pac. R.R. Co. v. Bay Area Shippers Consolidating Ass'n, Inc.*, 594 F.2d 1291, 1293 (9th Cir.1979) (per curiam) (quoting *United States v. Missouri–Kansas–Texas R.R.*, 194 F.2d 777, 779 (5th Cir.1952)). Makita suggests that in determining whether the term "San Jose" is ambiguous we should consider the parties' established pattern of dealing, and notes that Milne billed Makita at the discounted rate for shipments from both its Fremont and Cerritos locations.

This is precisely the sort of equitable defense that is barred by the Court's decision in *Maislin*, 110 S.Ct. at 2768–69. Accordingly, as to Makita shipments originating in Cerritos, we find that the tariff filed by Milne is unambiguous. Shipments originating in Cerritos were at no time eligible for the filed discount.

Returning to the question whether the tariff reference to "San Jose" should be construed to include shipments from Makita's facility in Fremont, we note that "San Jose" does not appear to be a technical term the interpretation of which raises larger questions of national transportation policy. On the present record, however, that conclusion is a tentative one. There may be established industry practices that govern the interpretation of tariff references to headquarters cities or to cities located within larger metropolitan regions. Moreover, the record is wholly devoid of any findings by the district court that would enable us to issue an authoritative construction of the tariff. In particular, further factfinding is necessary in order to clarify the intent of the parties with respect to the geographic scope of the discount rate offered by Milne. We therefore remand the task of interpreting the reference to "San Jose" in the amended tariff, and in particular the question whether Fremont is included under that term, to the district court in the first instance. If on remand the district court determines that the question whether "San Jose" may be read to refer to the entire San Francisco Bay area requires the specialized expertise of the ICC or implicates issues of national transportation policy, it should refer that question to the ICC for determination.

### III

■ Makita contends in the alternative that, if "San Jose" does not cover its shipments from other locations, the nondis-

---

**2.** As defined by the United States Census Bureau, the San Jose primary metropolitan statistical area (PMSA) includes only towns located in Santa Clara County. Bureau of Census, U.S. Dep't of Commerce, Statistical Abstract of the United States 911 (111th ed. 1991). Fremont, located in neighboring Alameda County, is in-

cluded in the Oakland PMSA. *Id.* at 910. However, the San Francisco–Oakland–San Jose consolidated metropolitan statistical area (CMSA), which covers, roughly, the entire San Francisco Bay area, includes the San Francisco, Oakland, and San Jose PMSAs. *Id.* at 911.

counted filed rate is unreasonable and the district court erred in granting summary judgment to Milne without referring the matter to the ICC so that the agency could determine whether Milne's nondiscounted filed rate was reasonable.[3] It argues that the filed rate doctrine as discussed in *Maislin* does not bar a defense of rate unreasonableness, that the determination of the reasonableness of a rate falls within the primary jurisdiction of the ICC, and that the district court was required to refer the question to the ICC upon Makita's request that it do so. We agree.

The issue that we must resolve here is not whether the reasonableness of motor common carrier rates falls within the primary jurisdiction of the ICC.[4] The Court has long held that the issue of reasonableness requires "preliminary resort to the Commission." *Great N. Ry. v. Merchants Elevator Co.*, 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922). Rather, the question before us is whether a shipper may raise unreasonableness of the rates as a defense in a filed rate action and thereby cause the proceedings to be stayed until the ICC resolves the claim.

Under the Act, a carrier may not charge or receive a different rate than that specified in its filed and published tariff. 49 U.S.C. §§ 10761, 10762. The Court has interpreted that requirement strictly. *Maislin*, 110 S.Ct. at 2766. " 'Deviation from it is not permitted upon any pretext.... This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress ... in order to prevent unjust discrimination.' " *Id.* (quoting *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915)). However, the filed rate doctrine also provides that a filed rate is not enforceable if it is unreasonable. *Id.* at 2767. Because the shipper did not raise the issue of the reasonableness of the rate, the *Maislin* Court did not need to consider whether the filed rate doctrine bars an unreasonable *rate* defense. *Id.* at 2767 n. 10. Prior decisions contain conflicting indications as to how the Court would rule on this issue. Six other circuits and the ICC have already decided the question, however, and it is to those decisions that we now turn.

The Fourth and Fifth Circuits have ruled that a shipper that pleads unreasonableness as a defense to an action for collection of a filed rate must pay the filed rate and then seek reparations in a separate proceeding before the ICC. *In re Carolina Motor Express, Inc.*, 949 F.2d 107, 110 (4th Cir.1991), *cert. granted sub nom. Reiter v. Cooper*, —— U.S. ——, 112 S.Ct. 1934, 118 L.Ed.2d 541 (1992); *Supreme Beef Processors, Inc. v. Yaquinto*, 864 F.2d 388, 392 (5th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3254, 111 L.Ed.2d 763 (1990). By contrast, in *Delta Traffic Serv., Inc. v. Transtop, Inc.*, 902 F.2d 101 (1st Cir.1990), the First Circuit concluded that a stay of district court proceedings "pending ICC determination of the tariff's reasonableness, will not preclude eventual collection of any filed rate; it is not inequitable; it will permit decisionmaking by the expert body; it will advance, rather than retard, primary jurisdiction policies." *Id.* at 106. In addition, the Seventh Circuit has indicated without discussion that a shipper may seek such a stay. *Western Transp. Co. v. Wilson & Co.*, 682 F.2d 1227, 1231 (7th Cir.1982). Finally, the Second and Eighth Circuits have allowed referral of

---

**3.** Appellees contend that Makita did not challenge the reasonableness of Milne's filed rate in the district court. An examination of the record reveals that Makita raised the issue of reasonableness not only in its answer to the complaint, but also in its motion for referral to the ICC and again in its opposition to plaintiffs' motion for summary judgment.

**4.** The doctrine of primary jurisdiction, discussed above in the context of tariff construction, requires referral to the appropriate administrative body "whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of [that] administrative body." *Western Pac. R.R.*, 352 U.S. at 64, 77 S.Ct. at 165; *United States v. General Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir.1987). Judicial resolution of the underlying claim for relief is "suspended" until an administrative ruling has issued. *Western Pac. R.R.*, 352 U.S. at 64, 77 S.Ct. at 165.

the reasonableness issue to the ICC in cases in which an adequate reparations remedy was no longer available to the shipper. *Atlantis Express, Inc. v. Standard Transp. Servs., Inc.*, 955 F.2d 529, 536–37 (8th Cir.1992) (carrier had liquidated before the suit for recovery of the filed rate was brought on its behalf); *Duffy v. BMC Indus., Inc.*, 938 F.2d 353, 357–58 (2d Cir. 1991) (two-year limitations period for a suit for reparations had expired before the carrier filed its suit for recovery of the filed rate). Both courts declined to consider whether they would extend the same rule to all filed rate actions. After examining the views of the other circuits, we conclude that the approach adopted by the First and Seventh Circuits is the soundest of the various alternatives.

The First Circuit reasoned that because shippers have a statutory right to seek reparations for unreasonably high charges, they should be able to assert the unreasonableness of a filed rate as a defense in a suit brought by a carrier to recover that rate. *Delta Traffic Serv.*, 902 F.2d at 106. Chief Judge Breyer noted that the Court has consistently differentiated between the filed or "legal" rate and the "lawful" rate—a rate that is reasonable. *Id.* at 104 (citing *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915), and *Arizona Grocery Co. v. Atchison, T. & S.F. Ry. Co.*, 284 U.S. 370, 384, 52 S.Ct. 183, 184, 76 L.Ed. 348 (1932)). He further observed that the federal courts have a longstanding policy of deferring to the judgment of the ICC on issues of rate reasonableness. *Id.* at 104–05. He concluded that allowing shippers to obtain a stay of district court proceedings by pleading unreasonableness of the filed rate would protect them, as well as carriers, and would preserve the authority of the ICC to ensure uniform and reasonable rates. *Id.* at 105–06. We agree.

Unlike the Fourth and Fifth Circuits, we do not believe that referral of rate unreasonableness defenses to the ICC will undermine the filed rate doctrine. We reject the Fourth Circuit's view that a rule allowing a shipper to obtain a stay of the district court proceedings in a filed rate action pending the ICC's resolution of a reasonableness defense would "provide a strong incentive for shippers routinely to contest the validity of the carrier's rates in order to delay paying the carrier's filed rate." *Carolina Motor Express*, 949 F.2d at 110. Although our conclusion that the district court erred in refusing to refer the issue of the reasonableness of Milne's filed rate to the ICC obviates the need for us to consider Makita's argument that the district court erred in awarding Milne prejudgment interest, we note that the ICC has a longstanding practice of awarding prejudgment interest on amounts recovered by carriers in filed rate actions and that the Court has upheld that practice. *Louisville & Nashville R.R. Co. v. Sloss–Sheffield Steel & Iron Co.*, 269 U.S. 217, 238–40, 46 S.Ct. 73, 80–81, 70 L.Ed. 242 (1925); *see also Consolidated Rail Corp. v. Certainteed Corp.*, 835 F.2d 474, 478 (3d Cir.1987); *Inman Freight Systems, Inc. v. Olin Corp.*, 807 F.2d 117, 121 (8th Cir.1986). Because a shipper's potential liability for prejudgment interest increases commensurate with any delay in payment of the filed rate, no benefit ultimately accrues to a shipper that asserts a frivolous or groundless claim of unreasonableness.

■ Moreover, the district court need not refer the issue of reasonableness to the ICC if there is no reasonable likelihood that the ICC will reach a determination favorable to the shipper. *Atlantis Express*, 955 F.2d at 537; *Delta Traffic Serv.*, 902 F.2d at 106; *see also Carolina Motor Express*, 949 F.2d at 113 (Hall, J., dissenting) ("[A] complaining shipper should be required to present a threshold level of evidence of unreasonableness before referral is warranted...."). "We consider the ICC's criteria for determining reasonableness to be highly probative of what evidence supports referral." *Atlantis Express*, 955 F.2d at 537; *see Petitions for Issuance of Rate Reasonableness and Unreasonable Practices Policy Statement*, Ex Parte No. MC–177 (Sub—No. 2), 8 I.C.C.2d 61 (Aug. 15, 1991), 1991 WL 174898, 1991 MCC LEXIS 144, at *23–31.

We are also influenced by the fact that the ICC, the expert body charged with administering the Act, has recently considered the question that confronts us here, and has ruled that rate unreasonableness may be raised as a defense in actions for collection of the filed rate. *See* 8 I.C.C.2d 61, 1991 WL 174898, 1991 MCC LEXIS 144. We agree with the ICC's reasoning.[5] The ICC concluded that the Act did not require shippers to pay the filed rate and then seek reparations. Rather, it held, Congress intended that the shipper pay only the reasonable rate at all times. The ICC based its conclusion in part on the practical fact that suits for the recovery of undercharges often arise out of bankruptcy proceedings involving the now-defunct carrier. "Where the motor carrier is insolvent and hence unable to satisfy any subsequent reparation order, enforcement of the filed tariff without referral to the ICC would undermine the meaningful exercise of our unreasonable-rate jurisdiction and would deny the shipper an adequate remedy." 1991 WL 174898, 1991 MCC LEXIS 144, at *14; *see also Atlantis Express*, 955 F.2d at 536–37; *Carolina Motor Express*, 949 F.2d at 113 (Hall, J., dissenting). In our view, however, there is no reason to differentiate between undercharge cases brought on behalf of bankrupt carriers and the small minority of such cases brought by carriers that are solvent. It is possible, for example, that a solvent carrier might delay filing suit for recovery of the filed rate until the expiration of the two-year limitations period for a reparations claim by the shipper. If the defendant shipper in such a suit may not raise an unreasonable rate defense, it is left without a remedy. " 'Only the clearest congressional language could force us to a result which would allow a carrier to recover unreasonable charges with impunity merely by waiting two years before filing suit.' " 1991 WL 174898, 1991 MCC LEXIS 144, at *17 (quoting *Western Pac. R.R.*, 352 U.S. at 71, 77 S.Ct. at 169).

The Court's holding in *Maislin* that a shipper may not assert unreasonable practices as a defense does not affect our conclusion. As we have noted, the Court expressly left open the reasonable rate question. Moreover, the existence of a statutory right to recover unreasonably high charges signifies a clear congressional intent to allow shippers to resist collection of the filed rate where appropriate. *Delta Traffic Serv.*, 902 F.2d at 106. A claim of rate unreasonableness therefore does not constitute an attempt to obtain an *equitable* offset against the filed rate, as did the unreasonable practice defense disapproved for that reason in *Maislin*. 110 S.Ct. at 2768–69. Rather, a reasonable rate defense is a legitimate assertion of the shipper's statutory right not to pay the filed rate.

In summary, we conclude, as did the First Circuit and the ICC that a rule allowing the district court to stay proceedings for recovery of a filed rate once the shipper has shown that there is "a sufficient possibility of an 'unreasonableness' determination to warrant referral [to the ICC]," *Delta Traffic Serv.*, 902 F.2d at 106, best effectuates the purposes of the Act. We find that such a possibility exists here. The discounted rate paid by Makita was substantially lower than Milne's filed rate and Makita's General Manager testified under oath that there were other trucking companies offering rates comparable to Milne's discounted rate. *See* 1991 WL 174898, 1991 MCC LEXIS 144, at *27–32 (listing factors that the ICC considers to be relevant in determining whether rates are unreasonable). Accordingly, we reverse the grant of partial summary judgment in favor of C/M and Milne and instruct the district court to await the outcome of the ICC's determination as to the reasonableness of the rate as to shipments from Cerritos, and as to shipments from Fremont if it determines that "San Jose" does not include Fremont.

5. We need not decide whether *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), is applicable to the ICC's ruling. The ruling was issued subsequent to the filing of briefs on appeal. Neither party argued the question of the deference to be given the agency decision. In any event, the answer would not affect our decision here.

## IV

Finally, Makita argues that the district court erred in dismissing its counterclaims against Milne as barred by the filed rate doctrine. We agree with Milne and C/M that Makita's claims for damages based on Milne's allegedly negligent or fraudulent conduct are barred under *Maislin.* Accordingly, we affirm the district court's order of dismissal with respect to Makita's first two counterclaims. We also affirm the dismissal of Makita's statutory counterclaim for damages resulting from the imposition of unreasonable rates.

■ Makita's first counterclaim alleges that Milne's conduct in representing to Makita that the rates it offered had been or would be filed constituted fraud, or, in the alternative, negligence. The second counterclaim alleges that Milne's failure to file the rates that it had negotiated with Makita was negligent or fraudulent. Both counterclaims seek damages in "an amount equal to the difference between the freight rates negotiated and agreed upon by [Milne] and already paid in full by [Makita] and the higher freight rates demanded by [Milne] in the complaint." Plainly this is no more than a claim that "a finding that the carrier engaged in an unreasonable practice should ... disentitle the carrier to collection of the filed rate." *Maislin,* 110 S.Ct. at 2767. After *Maislin,* such a claim will not lie. *Id.* at 2769 ("[S]trict adherence to the filed rate has never been justified on the ground that the carrier is equitably entitled to that rate, but rather that such adherence, despite its harsh consequences in some cases, is necessary to enforcement of the Act.").

Makita argues that *Maislin* established only that a shipper may not raise equitable *defenses* in an action for collection of the filed rate, and that there is no language in *Maislin* to suggest that the Court intended to preclude the normal rules of pleading with respect to *counterclaims* in such actions. In light of the background rules that govern the availability of common law remedies for conduct regulated by the Act, this is a distinction without a difference. Common law remedies survive the Act only to the extent that they are consistent with the statutory scheme. *Hewitt–Robins Inc. v. Eastern Freight–Ways, Inc.,* 371 U.S. 84, 89, 83 S.Ct. 157, 160, 9 L.Ed.2d 142 (1962). In particular, "[t]he rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." *Square D Co. v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 416–17, 106 S.Ct. 1922, 1926–27, 90 L.Ed.2d 413 (1986) (quoting *Keogh v. Chicago & Northwestern R.R. Co.,* 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922)); *see also Consolidated Freightways Corp. v. Terry Tuck, Inc.,* 612 F.2d 465, 466 (9th Cir.) ("[N]o claim for relief can be predicated on a carrier's alleged fraudulent misquotation of tariffs."), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2990, 64 L.Ed.2d 856 (1980). Makita attempts to characterize its two common law counterclaims as challenges to Milne's *practices,* not to its rates. Even if this be so, it is of no assistance to Makita.

■ As to Makita's statutory counterclaim, we agree with Milne and C/M that Makita has not suffered an injury cognizable under 49 U.S.C. § 11705. That section provides: "A common carrier providing transportation or service subject to the jurisdiction of the [Interstate Commerce] Commission ... is liable for damages resulting from the imposition of rates for transportation or service the Commission finds to be in violation of this subtitle." 49 U.S.C. § 11705(b)(3). Because Makita paid the discounted rate on all of the shipments at issue here, it has suffered no damages resulting from the imposition of unreasonable rates. Accordingly, we affirm the district court's dismissal of this counterclaim as well.

The judgment of the district court is

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH DIRECTIONS TO AWAIT THE ICC'S DETERMINATION OF THE REASONABLENESS OF THE RATE. Costs on appeal shall be assessed against Milne and C/M.