OPINION
PHILLIPS, Circuit Judge:
Transrisk Corporation, Inc. (“Transrisk”), assignee of Allegheny Freight Lines (“Allegheny”), appeals from a summary judgment denying its “undercharge” claim against Mat-sushita Electric Corporation d/b/a Panasonic Company (“Panasonic”).[1] Because we agree with the district court that pursuant to its *315 agreement with Panasonic, Allegheny acted as a motor contract carrier, not a motor common carrier, we affirm.
I
From March through December 1989, Allegheny, an interstate motor carrier based in Virginia, transported approximately 600 shipments for a shipper, Panasonic. Prior to these shipments, the two companies had entered into a written “Transportation Agreement” (“the Agreement”). The Agreement begins with a provision that Allegheny “has authority from the Interstate Commerce Commission to operate as a contract carrier”.[2] It goes on to state that “[c]ustomer [Panasonic] does' not guarantee any minimum number of shipments, tonnage, or revenue.” The Agreement also identifies the specialized services Allegheny would provide Panasonic, including a promise to specially insure its carriage of Panasonic shipments in ways not required of a common carrier, and permission for Panasonic to pay freight bills within 80 days while shippers under common carrier agreements have only 14. Finally, it includes a detailed schedule of negotiated rates that Panasonic agreed to pay Allegheny for its services.
Following the signing of the Agreement, Allegheny began carrying Panasonic cargo, and Panasonic, in return, made payments according to the agreed upon rate schedule. As noted, over 600 shipments were carried pursuant to the Agreement.
In January 1990, Allegheny filed for bankruptcy. It was taken over by Transrisk which, under an agreement with the carrier, performed audits to determine whether rates based on applicable filed tariffs had been paid to Allegheny by its customers. Trans-risk’s deal with Allegheny provided that if there were any balances due Allegheny using the filed rate benchmark, Transrisk could bill and collect as assignee of Allegheny.
For purposes of its audit of the Panasonic account, Transrisk assumed that the Agreement, and the shipments handled thereunder, were not sufficient to qualify for motor contract carriage. From Transrisk’s perspective, Allegheny acted as a motor common carrier, and the higher filed rates should apply. Transrisk then subtracted the lower negotiated rates Panasonic had paid pursuant to the Agreement from the higher filed rates and determined that the shipper had been undercharged for freight services in the amount of $104,730.59. Transrisk later revised this figure downward to its present claim for $43,487.66.
When Panasonic refused to accede to Transrisk’s demand for payment, Transrisk on behalf of Allegheny brought this suit in federal district court in-Maryland. Panasonic, asserting that all services provided by Allegheny were pursuant to a written agreement sufficient to qualify for motor contract carriage, sought summary judgment. Allegheny, contending that the Agreement did not comprise a pact for contract carriage, filed a cross-motion for summary judgment.
Finding it “patent that the plaintiffs predecessor, Allegheny, was a contract carrier for Panasonic”, the district court granted Panasonic’s motion for summary judgment. Transrisk v. Matsushita, No. 92-660, 1993 WL 581057 (D.Md. filed March 17, 1993). This appeal by Allegheny followed.
II
Allegheny contends that the Agreement was insufficient to make it a motor contract carrier because (1) it failed to satisfy the “distinct needs” requirement embodied in the Interstate Commerce Act’s (“The Act”) definition of “motor contract carrier”; and (2) it failed to fulfill the criteria set out by the ICC in 49 C.F.R. § 1053.1 for “continuing agreements”.
The Act defines a “motor contract carrier” as
a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons—
(i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or
*316 (ii) designed to meet the distinct needs of each such person.
49 U.S.C. § 10102(15)(B) (1988) (emphasis added).
“Distinct needs”, as interpreted by the federal courts, “is a need for a different or a more select or a more specialized service than common carriage provides.” Global Van Lines, Inc. v. Interstate Commerce Commission, 804 F.2d 1293, 1301 (D.C.Cir.1986) (quoting Interstate Commerce Commission v. J-T Transp. Co., 368 U.S. 81, 91, 82 S.Ct. 204, 210, 7 L.Ed.2d 147 (1961)).
“Continuing agreements” is defined by ICC regulation:
No contract carrier by motor vehicle, as defined by 49 U.S.C. 10102(12) shall transport property for hire in interstate or foreign commerce except under special and individual contracts or agreements which shall be in writing, shall provide for transportation for a particular shipper or shippers, shall be bilateral and impose specific obligations upon both carrier and shipper or shippers, shall cover a series of shipments during a stated period of time in contrast to contracts of carriage governing individual shipments, and copies of which contracts or agreements shall be preserved by the carriers parties thereto so long as such contracts or agreements are in force and for at least one year thereafter.
49 C.F.R. § 1053.1 (1991).[3]
A.
Of the two, the “distinct needs” issue is the more easily resolved in Panasonic’s favor. The Agreement clearly indicates that Allegheny agreed to provide certain services to Panasonic that a common carrier would be under no obligation to offer. Allegheny does not contest Panasonic’s contention that provisions for several specialized services are in the Agreement. Among them: (i) Allegheny would accept all of Panasonic’s shipments, and at a rate different from the filed rate, (ii) Allegheny would specially insure its carriage of Panasonic shipments in ways not required of a common carrier, (iii) Panasonic had 30 days to pay freight bills while shippers under common carrier agreements had 14. We therefore conclude, with the district court, that as a matter of law, the “distinct needs” requirement for contract carriage was fulfilled. Global Van Lines, 804 F.2d at 1301; Dan Barclay, Inc. v. Stewart & Stevenson Services, 761 F.Supp. 194, 200 (D.Mass.1991).
B.
The “continuing agreements” issue is less elearcut, but ultimately must also be decided in favor of Panasonic.
Under the ICC regulation in effect at the time, 49 C.F.R. § 1053.1, whether a shipper-carrier relationship constitutes a continuing agreement depends on whether five criteria are met. In this case, three are clearly met. First, the agreement between the parties is “in writing”. Second, it provides for transportation for “a particular shipper”, Panasonic. Third, a copy of the agreement has been “preserved” by the parties.
The fourth requirement—that the agreement “shall cover a series of shipments during a stated period of time in contrast to contracts of carriage governing individual shipments”—is essentially a question of whether the shipper-carrier relationship is “continuing”. In this case, the volume—over 600—and duration—over six months—of shipments indicate that the line between single or individual shipments (which can only qualify as common carriage) and an extended and continuous series of shipments (sufficient for contract carriage) was crossed. As one federal court recently noted, “‘continuing’ refers to regularly recurring needs, and repeated transactions, not isolated transactions.” Barclay, 761 F.Supp. at 202. In *317 addition, the Agreement contains a stated time period.[4]
The fifth, and final, requirement— that the agreement “shall be bilateral and impose specific obligations upon both carrier and shipper”—is the most problematic. Under the Agreement, Panasonic “does not guarantee any minimum number of shipments”. The absence of a provision requiring the shipper to tender a specific or minimum number of shipments raises an obvious problem that has bothered some courts asked to find an agreement for contract carriage. See Matter of Steve D. Thompson Trucking, Inc., 989 F.2d 1424 (5th Cir.1993); Barclay, 761 F.Supp. at 203. Cf. In re United Shipping Co., 134 B.R. 359 (Bankr. D.Minn.1991) (finding agreement between shipper and carrier bilateral because shipper obligated to tender at least one shipment per year).
However, none of those eases involved a number of shipments comparable to the 600 plus Panasonic tendered to Allegheny. For example, the carrier in Thompson Trucking transported 35 shipments; the carrier in Barclay handled only two. Furthermore, Thompson Trucking, upon which Allegheny relies for the proposition that the absence of a minimum tender clause dooms a contract carriage defense, actually rests primarily on the fact that the shipper used a carrier that had not obtained a permit for contract carriage prior to the purported contract carriage shipments.[5] Here, by contrast, Allegheny had obtained a .permit for contract carriage and prominently included this fact in the Agreement with Panasonic.
Moreover, under the recent ICC decision in General Mills, Inc.—Petition for Declaratory Order—Certain Rates and Practices of United Shipping Company, Inc., 8 I.C.C.2d 313 (1992), aff'd (Bankr.D.Minn. 1992) (appeal currently pending before Eighth Circuit), only “substantial compliance” with the requirements of 49 C.F.R. § 1053.1 is necessary to find motor contract carriage. Rather than requiring complete compliance, General Mills held that the key issue in determining whether there was a motor common or motor contract agreement is the intent of the parties: “The contract may be incomplete or deficient in other respects, but these shortcomings will not change the status of the carriage from that intended by the parties at the time of transportation.” 8 I.C.C.2d at 321. See also, W.W. Grainger, Inc. v. United Shipping Company, Inc.—Petition for Declaratory Order—Certain Rates and Practices of United Shipping Company, Inc., 1992 Fed.Car.Cas. (CCH) ¶ 37,988 (ICC, May 27, 1992) (finding parties’ intent and subsequent conduct enough to overcome deficiencies in agreement for contract carriage).
In General Mills, the Commission found “substantial compliance” even though the shipper-carrier agreement appeared not to require the shipper to tender any minimum number of shipments. “While it [the agreement] does not specifically reference a number of shipments to be tendered, considered in its entirety it can easily be contrasted to multiple contracts governing individual shipments.” 8 I.C.C.2d at 323.
In the instant case we think it apparent as a matter of law that the intent of the parties, at the time of transportation, was that Allegheny was to operate as a motor contract carrier for Panasonic. First, as in General Mills, the Agreement states up front that it is an agreement to do business under Allegheny’s contract carrier authority. Second, it contains several provisions pertaining to Panasonic’s specialized needs. And third, it includes an extensive, detailed schedule of negotiated rates.
Allegheny contends that we owe no deference to the ICC’s interpretation of its *318 regulation as reflected in General Mills because the “ICC’s now meager standard of proof of contract carriage” shows that it “exercise^] no true expertise.” Appellant’s Brief at 23. We disagree. We believe to the contrary that the agency’s interpretation in this matter is entitled to deference under Chevron United States Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). See Reiter v. Cooper, — U.S. -, -, 113 5.Ct. 1213, 1221, 122 L.Ed.2d 604 (1993) (ICC interpretation of Interstate Commerce Act “at least a reasonable interpretation of the statute, and hence a binding one,” citing Chevron). The matter at issue lies clearly within the range of agency expertise.
III.
Wé therefore conclude that the district court properly determined that, as a matter of law on the summary judgment record, Allegheny acted as a contract motor carrier under its agreement with Panasonic, hence is not entitled to the claimed 'undercharges.[6]

AFFIRMED.

. The motor carrier industry refers to the difference between the rates filed with the Interstate Commerce Commission ("ICC”) (and charged for common carriage) and lower negotiated rates (charged for contract carriage) as the “undercharge." This case is typical of many undercharge cases which arise when a motor carrier attempts to collect the difference between the negotiated rate actually paid by the shipper and the higher rate on file with the ICC. See generally, Howard R. Rubin, Note, Reiter v. Cooper and Unreasonable Rates: Are Reports of the Filed Rate Doctrine's Death Greatly Exaggerated?, 42 Duke LJ. 905 (1993).

. Allegheny also operated as a motor common carrier.

. Effective June 20, 1992, the I.C.C. repealed 49 C.F.R. § 1053.1 in an effort to reduce the overly technical requirements needed to attain motor contract carriage status. See Contracts for Transportation of Property, 57 Fed.Reg. 21616-01 (I.C.C.1992). Both parties agree that the regulation was in effect during the course of their agreement, and is controlling for purposes of this case.

. “This Agreement shall be in force for a period of one year from the date hereof and shall be automatically renewed from year to year ... [but] this Agreement may be terminated by either party at any time by giving thirty (30) days prior written notice to the other party.” In In re United Shipping Co., 134 B.R. 359, 365 (Bankr. D.Minn.1991), the court found a similar provision in a shipper-carrier agreement sufficient to satisfy the "stated time period” requirement.

. “[B]ecause [the shipper] did not ship its goods pursuant to a valid contract carriage permit, it was subject to the applicable filed tariff.” 989 F.2d at 1434.

. This disposition makes it unnecessary to consider other issues debated by the parties premised on a determination that Allegheny acted as a common carrier for Panasonic.