**TRANS–ALLIED AUDIT COMPANY, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION, United States of America, Respondents.**

**Twin Modal, Inc., Intervenor.**

**No. 93–1211.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 11, 1993.

Decided Sept. 7, 1994.

---

nitions.

Paul Taylor, Bloomington, MN, argued (Alan D. Harris, on the brief), for petitioner.

Laurenc Schecker, Washington, DC, argued (John W. Clark, Robert B. Nicholson, Robert S. Burk and Craig M. Keats, on the brief), for respondent.

Before McMILLIAN, Circuit Judge, LAY, Senior Circuit Judge, and BOWMAN, Circuit Judge.

McMILLIAN, Circuit Judge.

Trans–Allied Audit Co. (Trans–Allied), assignee of the accounts receivable of Rose Freight Lines, Inc. (Rose), seeks review of a final decision of the Interstate Commerce Commission (ICC). The ICC determined that 158 shipments transported by Rose for Twin Modal, Inc. (Twin Modal) after July 31, 1985, were contract carriage and that, with respect to 33 shipments transported by Rose for Twin Modal before that date, Rose had not "participated" in the mileage guide tariff referenced in its distance commodity rates tariffs and therefore had no valid tariffs on file with the ICC. *Trans–Allied Audit Co.,* No. 40322, 1992 WL 356680 (I.C.C. Nov. 27, 1992). For reversal, Trans–Allied argues the ICC erred in finding (1) the transportation relationship between Rose and Twin Modal after July 31, 1985, constituted contract carriage and (2) its filed tariff was not valid. For the reasons discussed below, we deny the petition for review.

## REGULATORY BACKGROUND

■ In order to lawfully provide interstate motor carriage, a person must obtain appropriate operating authority from the ICC. Carriers can provide common carriage or contract carriage or both. 49 U.S.C. §§ 10921–10923; *see Central & Southern Motor Freight Tariff Ass'n v. United States,* 244 U.S.App.D.C. 226, 757 F.2d 301 (describing regulatory history of motor common and contract carriage), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). The prohibition against "dual operations," that is, providing both common and contract carriage, was eliminated in 1980. Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793 (repealing 49 U.S.C. § 10930(a)(1)); *Deletion of Dual Operations Policy,* Ex Parte No. 55 (Sub–No. 42), 45 Fed.Reg. 45,528 (1980). Rose had common carriage authority and later also contract carriage authority. The ICC also licenses brokers under 49 U.S.C. § 10924. Brokers arrange transportation by matching shippers and carriers. 49 U.S.C. § 10102(1) (definition). Twin Modal is a broker.

■ Because Congress has given the ICC broad regulatory responsibility over a carrier's contract carriage operations, *ICC v. J–T Transport Co.,* 368 U.S. 81, 88, 82 S.Ct. 204, 209, 7 L.Ed.2d 147 (1961), it is for the ICC to

interpret and apply the statutory standards that define contract carriage. *Atlantis Express, Inc. v. Standard Transportation Services, Inc.,* 955 F.2d 529, 532–34 (8th Cir. 1992). A motor common carrier is defined as "a person holding itself out to the general public to provide motor vehicle transportation for compensation." 49 U.S.C. § 10102(14). By contrast, a motor contract carrier is not required to provide motor vehicle transportation service to the general public but instead enters into continuing agreements with shippers and must either dedicate equipment to its shippers' "exclusive use" or provide transportation designed to meet its shippers' "distinct needs." 49 U.S.C. § 10102(15)(B)(ii). At the time of the shipments at issue in the present case, ICC regulations also required that contract carrier agreements be bilateral and in writing, provide for transportation for a particular shipper or shippers, impose specific obligations upon both carrier and shipper or shippers, and cover a series of shipments during a stated period of time in contrast to separate contracts of carriage governing individual shipments. 49 C.F.R. § 1053.1 (1991) (repealed, effective June 20, 1992, in *Contracts for Transportation of Property,* Ex Parte No. MC–198 (I.C.C. Mar. 5, 1991, Sept. 11, 1991), 8 I.C.C.2d 520 (1992), *appeal dismissed sub nom. Central States Motor Freight Bureau, Inc. v. United States,* No. 92–1258, 1993 WL 558020 (D.C.Cir. Dec. 28, 1993) (order)).[1]

■ Motor common carriers must file public tariffs containing their rates and charges with the ICC. 49 U.S.C. § 10762; *see, e.g., Security Services, Inc. v. Kmart Corp.,* —— U.S. ——, ——, 114 S.Ct. 1702, 1706, 128 L.Ed.2d 433 (1994). The applicable tariff rate (the filed rate) filed by a motor common carrier is the legal rate and the only rate that the carrier may charge, and that a shipper may pay, for common carriage unless and until that rate is set aside by the ICC as unreasonable or unlawful. 49 U.S.C. § 10761(a); *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 120, 128–

29, 110 S.Ct. 2759, 2762–63, 2766–67, 111 L.Ed.2d 94 (1990) (*Maislin*); *see also Reiter v. Cooper,* —— U.S. ——, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). The purpose of the filed rate doctrine is to prevent rate discrimination and to promote rate stabilization. *Maislin,* 497 U.S. at 119, 110 S.Ct. at 2762.

■ "The ICC has authority to 'prescribe the form and manner' of tariff filing, [49 U.S.C.] § 10762(b)(1), and the information to be included in tariffs beyond any matter required by statute, [49 U.S.C.] § 10762(a)(1)." *Security Services, Inc. v. Kmart Corp.,* —— U.S. at ——, 114 S.Ct. at 1706. By ICC regulation, there are two basic methods of tariff filing: a carrier can prepare and file its own individual tariffs or it can adopt the rates contained in the tariffs filed by another carrier or agent. However, a carrier can formally bind itself to a tariff filed by another carrier or agent, including incorporating by reference another tariff into its own tariff, only if it "participates" in the other entity's tariff. *See* 49 C.F.R. § 1312.-27(e) (1993). A carrier can participate in a tariff filed by another carrier (or an agent) by issuing a power of attorney or concurrence. *Id.* §§ 1312.4(d), 1312.10(a) ("Powers of attorney may be given by a carrier to a carrier or an agent for the purpose of publishing and filing tariffs."), (b)(1) (a concurrence is executed by a carrier who wishes "to participate in joint rates or provisions published in a tariff filed by another carrier or agent"). Although in 1989 the ICC no longer required that the actual powers of attorney be filed with the ICC, 48 Fed.Reg. 31,265, 31,266 (1983); *Revision of Tariff Regulations—All Carriers,* 1 I.C.C.2d 404, 408 (1984), the ICC continued to require that powers of attorney or concurrences be executed. Absent an effective power of attorney, any reference to a separate tariff is void as a matter of law. 49 C.F.R. § 1312.4(d) ("void-for-nonparticipation" regulation); *see, e.g., Atlantis Express, Inc. v. Associated Wholesale Grocers, Inc.,* 989 F.2d 281, 282–83 (8th Cir.1993).

---

1. The regulations were reinstated by the Negotiated Rates Act of 1993, Pub.L. No. 103–180, 107 Stat. 2044 (codified as amended at 49 U.S.C.A. § 10701 (West Supp.1994) (effective Dec. 3, 1993)).

In comparison to motor common carriers, motor contract carriers set their own rates, which can be higher or lower than common carrier rates (but usually lower) and which are exempt from the tariff filing requirement (and the filed rate doctrine). 49 U.S.C. §§ 10761(b), 10762(f); *Exemption of Motor Contract Carriers from Tariff Filing Requirements*, 133 M.C.C. 150 (1983), *aff'd sub nom. Central & Southern Motor Freight Tariff Ass'n v. United States*, 244 U.S.App. D.C. 226, 757 F.2d 301, *cert. denied*, 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985).

## BACKGROUND FACTS

In late 1984 Twin Modal, an ICC-licensed property broker, began negotiations with Rose, an ICC-licensed motor carrier, for freight transportation services. At that time Rose had common carrier authority and was in the process of obtaining contract carrier authority as well. Twin Modal and Rose reached an agreement but did not actually execute a written contract for contract carriage until July 31, 1985. However, in December 1984, Twin Modal began tendering shipments to Rose for shipment. On July 24, 1985, Rose finally obtained contract carrier authority from the ICC, and Twin Modal and Rose executed a written agreement for contract carriage on July 31, 1985. It is undisputed that Twin Modal and Rose intended a contract carriage agreement. Under the agreement Twin Modal agreed to "proceed with its best efforts to solicit and obtain freight hauling agreements" for Rose, and Rose agreed to accept all shipments tendered to the extent of its equipment capacity and to transport and deliver such shipments as expeditiously as possible. Rose also agreed to obtain insurance and be liable for all losses or damage to freight. The term of the agreement was 1 year, automatically renewable for 1-year periods, unless terminated by either party upon 30 days notice in writing; the rate for shipments was to be set at the time freight was "delivered" by Twin Modal for shipment to Rose.

Rose handled a total of 191 loads brokered by Twin Modal—33 loads between December 10, 1984, and July 24, 1985, before the parties executed the agreement, for a total of $19,-567.40, and 158 loads between August 13, 1985, and April 11, 1988, for a total of $77,-593.76. Twin Modal paid all the charges.

Rose filed a Chapter 11 petition in bankruptcy which was later converted to Chapter 7. Trans–Allied later acquired Rose's accounts receivable and brought an adversary action against Twin Modal to recover undercharges arising out of the shipments Rose had handled for Twin Modal. Applying the higher common carrier tariff rates, Trans–Allied alleged that Twin Modal owed $52,-356.24 in undercharges ($8,761.00 for the shipments before July 31, 1985, the date of the agreement, and $43,595.24 for the shipments thereafter).

Trans–Allied also filed a petition for a declaratory order before the ICC, claiming that the agreement between Twin Modal and Rose was not a valid contract for contract carriage because it did not satisfy either the statutory requirements or the regulatory requirements for contract carriage, and thus the shipments constituted common carriage. Trans–Allied specifically argued that the agreement was not bilateral and did not cover a series of shipments over a specified period of time, as required by the regulation, 49 C.F.R. § 1053.1, and did not require Rose to dedicate equipment to Twin Modal's exclusive use or provide equipment or services designed to meet Twin Modal's "distinct needs," as required by 49 U.S.C. § 10102(15). Trans–Allied also argued that Rose's common carrier tariffs were valid even though it conceded that Rose had "failed to participate in the governing distance guide."

## ICC DECISIONS

In October 1989 the ICC denied the petition for declaratory order on the grounds that there was no controversy. In dicta, however, the decision also reported that the agreement did not meet the statutory or regulatory criteria for contract carriage. In a letter Twin Modal objected to this dicta and sought reconsideration to delete the dicta from the order. The ICC treated the letter as a petition to reopen the proceeding and reopened the proceeding.

In November 1992, following submission of evidence and argument, the ICC reversed the prior order and found that Rose did not have contract carrier authority until July 24, 1985, and thus the 33 shipments it handled for Twin Modal before and on that date moved as common carriage. Slip op. at *3. The ICC also found that the shipments Rose transported after July 31, 1985, moved as contract carriage. *Id.* at *4. The ICC found that Rose provided Twin Modal with special transportation services designed to meet its distinct needs. *Id.* at *5 (Rose assumed all responsibility for loss or damage to freight, maintained cargo insurance coverage of $100,000, billed Twin Modal at rates agreed upon on dates freight was tendered). In addition, the ICC found that the agreement substantially complied with the regulatory requirements for contract carriage: the agreement was in writing and provided for transportation for a particular shipper, established bilateral obligations (Twin Modal agreed to use its best efforts to solicit and obtain freight hauling agreements and in fact tendered multiple shipments to Rose; in addition, Rose agreed to accept all shipments tendered and to provide certain special services), and covered a series of shipments over a period of time. *Id.* at *4–5. The ICC thus concluded that the shipments transported after July 31, 1985, pursuant to the agreement, were contract carriage, but the shipments transported on or before July 24, 1985, were common carriage. *Id.* at *5–6.

The ICC also found that Rose's filed rate was not effective, and thus could not be the basis for a claim for undercharges, because Rose, by its own admission, had failed to execute a power of attorney and thus had not participated in the distance mileage guide. *Id.* at *6–7. Rose's filed rate included two parts—a rate per mile and a distance mileage guide, the Household Goods Carriers Bureau (HGCB) Mileage Guide No. 12, ICC HGB 100–A. Because Rose failed to execute a power of attorney to participate in the HGCB mileage guide, Rose could not use the mileage guide to compute rates in its tariff and thus had no definite means for calculating the exact freight charges due for any particular shipment.

Trans–Allied filed a petition for review. Twin Modal's petition to intervene in support of the ICC and the United States was granted.

## STANDARD OF REVIEW

■ The applicable standard of review is the deferential standard of judicial review of agency decisions, that is, whether the agency decision is arbitrary, capricious, an abuse of discretion, or otherwise not supported by law. 5 U.S.C. § 706(2)(A), (D). Deference is particularly appropriate when the agency decision under review involves an agency's interpretation of its own statute and regulations. *Arkansas v. Oklahoma,* —— U.S. ——, ——, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). We will accept the findings of fact made by the agency, and the reasonable inferences drawn from those findings of fact, as long as the agency's findings are supported by substantial evidence in the record as a whole. In addition, whether a contract carriage or common carriage relationship existed between the parties is a matter within the primary jurisdiction of the ICC. *E.g., Atlantis Express, Inc. v. Standard Transportation Services, Inc.,* 955 F.2d at 532–34.

## DISTINCT NEEDS

■ Pursuant to 49 U.S.C. § 10102(15)(B), contract carriage is transportation provided under a continuing agreement by either assigning motor vehicles for the exclusive use of a shipper or by providing services designed to meet that shipper's distinct needs. At issue in the present case is the "distinct needs" requirement. "Distinct needs" refers to "a need for a different or a more select or a more specialized service than common carriage provides." *Transrisk Corp. v. Matsushita Electric Corp. of America,* 15 F.3d 313, 316 (4th Cir.1994), *citing Global Van Lines, Inc. v. ICC,* 256 U.S.App. D.C. 264, 804 F.2d 1293, 1301 (1986); *see also ICC v. J–T Transport Co.,* 368 U.S. at 90–93, 82 S.Ct. at 210–12. "Services are considered 'more specialized' to the extent that they

'[differ] in quality, in priority, in control by the shipper, or in some other significant respect, from the service a common carrier holds out to the public at large.'" *Dan Barclay, Inc. v. Stewart & Stevenson Services, Inc.*, 761 F.Supp. 194, 200 (D.Mass.1991), *citing Dixie Midwest Express, Inc.*, 132 M.C.C. 794 (1982).

 Trans–Allied first argues the post-July 31, 1985, shipments were not contract carriage because Rose did not provide services designed to meet Twin Modal's distinct needs. We disagree. Rose assumed all responsibility for loss and damage to freight and provided cargo insurance coverage, which, as a contract carrier, it was not required to do. Slip op. at *4 n. 6, *citing* 49 U.S.C. § 10927(a)(3) (motor common carriers are required to maintain insurance covering cargo liability); 49 C.F.R. § 1043.2(c) (motor common carriers must·maintain $10,000 in cargo insurance, $5,000 for cargo on one vehicle). Rose also billed Twin Modal at rates agreed upon as of the date on which each shipment was tendered, a service which allowed Twin Modal maximum flexibility to meet competition and to accommodate the needs of its customers. These are the kinds of specialized services that the ICC has found satisfies the distinct needs requirement. *See Transrisk Corp. v. Matsushita Electric Corp. of America*, 15 F.3d at 316 (specialized services provided by carrier included accepting all shipments at rate different from filed rate, special insurance in ways not required of common carrier, allowing 30 days to pay freight bills (shippers under common carrier agreements had 14 days to pay)); *Interstate Van Lines, Inc.*, 5 I.C.C.2d 168, 187–89 (1988) (specialized service based on distinct needs of household goods shippers included special pickup and delivery requirements; special documentation requirements; special liaison requirements; specialized equipment; special liability, claims and credit terms; specialized and incidental transportation services; and special rate options).

## REGULATORY REQUIREMENTS

 The statutory requirement of a "continuing agreement" for contract carriage is defined by 49 C.F.R. § 1053.1 (1991). This regulation was in effect at the time of the shipments at issue (as noted above, the ICC repealed the regulation, effective June 30, 1992, and Congress subsequently reinstated it, effective December 3, 1993). The regulation requires that the agreement between the parties be in writing, provide for transportation for a particular shipper (here, a particular broker), be preserved by the parties, cover a series of shipments during a stated period of time, and be bilateral and impose specific obligations upon both carrier and shipper (here, broker).

It is undisputed that the agreement satisfied the first three regulatory requirements—the agreement was in writing, provided for transportation for a particular shipper and had been preserved by the parties. At issue are the fourth and fifth requirements. Trans–Allied argues there was no "continuing agreement" between the parties because the agreement was not "continuing," that is, it did not cover a series of shipments during a stated period of time or specify a specific number of shipments.

 As a preliminary matter, we note that the ICC requires only substantial compliance with the regulatory requirements. *See General Mills, Inc.*, 8 I.C.C.2d 313, 321–23 (1992), *aff'd sub nom. Bankruptcy Estate of United Shipping Co. v. General Mills, Inc.*, 34 F.3d 1383 (8th Cir.1994). The ICC evaluates the character of the carriage by examining the totality of the circumstances, including the intent and conduct of the parties, as well as the terms of the written agreement. *See Commerce Express, Inc.*, No. 40348, 1992 WL 245497, at *2 (I.C.C. Oct. 1, 1992); *W.W. Grainger, Inc.*, 1992 Fed. Carr. Cas. (CCH) ¶ 37,988, No. 40541 (I.C.C. May 27, 1992) (1992 WL 125053); *see also Transrisk Corp. v. Matsushita Electric Corp. of America*, 15 F.3d at 317.

 The fourth "continuing agreement" or "series of shipments" requirement reflects another distinction between common carriage and contract carriage. Multiple individual shipments are characteristic of common carriage, whereas a series of shipments over a period of time is characteristic of

contract carriage. In other words, "continuing" refers to " 'regularly recurring needs,' and repeated transactions, not isolated transactions." *Dan Barclay, Inc. v. Stewart & Stevenson Services, Inc.*, 761 F.Supp. at 202 (citation omitted). What is important is whether the shipper-carrier relationship is "continuing." *Transrisk Corp. v. Matsushita Electric Corp. of America*, 15 F.3d at 316. We agree with the ICC that the agreement at issue in the present case satisfied the fourth requirement. The parties intended the agreement to cover a continuing series of shipments and their course of conduct confirmed this intent. Rose handled 158 shipments for Twin Modal over a period of almost 3 years; the agreement specified an automatically renewable term of 1 year and was renewed at least twice. *See id.* (more than 600 shipments over 6 months); *General Mills, Inc.*, 8 I.C.C.2d at 320–25 (more than 3,000 shipments over 2 years).

■■■ Next, Trans–Allied argues the agreement was not "bilateral" because it imposed no obligation on Twin Modal to use Rose's services. Trans–Allied argues Twin Modal only promised to use its best efforts and thus the agreement constituted nothing more than a general agreement to do business. As a matter of contract law, Trans–Allied's argument may have some merit. *See Transrisk Corp. v. Matsushita Electric Corp. of America*, 15 F.3d at 318 (Luttig, J., dissenting) (no bilateral obligation when shipper had no obligation to transport any shipments with carrier). However, what is at issue is not contract law but transportation law, specifically the ICC's interpretation and application of its own regulations. We agree with the ICC that the agreement at issue was bilateral and imposed specific obligations upon both carrier and shipper and thus satisfied the fifth regulatory requirement. Here, the ICC concluded that the agreement contained bilateral obligations "sufficient to establish mutuality of commitment," that is, Twin Modal promised to use its best efforts to solicit and obtain freight hauling agreements for Rose, and Rose promised to transport all shipments tendered by Twin Modal. Slip op. at *4. In addition, the parties' course of conduct fulfilled the bilateral obligations established in their agreement. As

noted by the ICC, "[f]or nearly 3 years, Twin Modal continuously obtained loads for Rose to transport; Rose handled the loads and billed Twin Modal in accordance with charges the parties negotiated under their agreement, and Twin Modal paid Rose's invoices." *Id.*

■■■ Trans–Allied also argues the agreement failed to include such essential terms as the destination of the shipments or specify the equipment to be provided, the number of shipments or volume of freight. Trans–Allied relies upon *MCI Telecommunications Corp. v. E.L. Murphy Trucking Co.*, 1989 Fed.Carr.Cas. (CCH) ¶ 37,748, No. MC–C–30115 (I.C.C. June 22, 1989) (1989 WL 238880) (*MCI*), and *Diversey Wyandotte Corp.*, 1990 Fed.Carr.Cas. (CCH) ¶ 37,821, No. 40342 (I.C.C. June 4, 1990) (1990 WL 288233) (*Diversey*). However, the regulation does not require the inclusion of these specific terms. To the extent that the *MCI* and *Diversey* decisions can be read to require the inclusion of such terms, the ICC has indicated that those decisions are inconsistent with the regulation and should not be followed. *See United Shipping Co.*, 134 B.R. 359, 365–66 & n. 7 (Bankr.D.Minn.1991). Moreover, as discussed above, we do not think the absence of specific terms which would be considered essential under contract law necessarily means that an agreement is not sufficient for purposes of determining compliance with the regulation.

## FILED TARIFF

■■ Trans–Allied next argues the ICC erred in retroactively invalidating its filed tariff applicable to the shipments made before Rose obtained its contract carrier authority on July 24, 1985. Trans–Allied argues that even though Rose admittedly failed to execute a power of attorney and thus did not participate in the distance part of the applicable tariff, that tariff is nonetheless effective because neither the rate nor the distance part has been suspended or set aside. For this reason, Trans–Allied argues the tariff is effective under the strictly-applied filed rate doctrine. *See ICC v. American Trucking Ass'ns*, 467 U.S. 354, 362, 104

S.Ct. 2458, 2463, 81 L.Ed.2d 282 (1984) (ICC has no authority to reject retroactively tariff submitted in substantial violation of agreement once tariff has gone into effect).

This court rejected this argument in *Atlantis Express, Inc. v. Associated Wholesale Grocers, Inc.*, 989 F.2d at 282–83, holding that a carrier which, like Rose, referred to the same distance guide for determination of the distances between locations covered by the distance rates, without executing a valid power of attorney, did not legally participate in the tariff and thus the filed tariff was void. *Accord Security Services, Inc. v. Kmart Corp.*, —— U.S. at ——–——, 114 S.Ct. at 1709–10; *Freightcor Services, Inc. v. Vitro Packaging, Inc.*, 969 F.2d 1563, 1566 (5th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993). *Atlantis Express, Inc. v. Associated Wholesale Grocers, Inc.* specifically disapproved the retroactive rejection argument, holding that the tariff in question was not rejected retroactively because it was incomplete and thus had not been effectively filed in the first place. 989 F.2d at 283; *see Security Services, Inc. v. Kmart Corp.*, —— U.S. at ——, 114 S.Ct. at 1709 (regulation does not apply retroactively). In addition, *Atlantis Express, Inc. v. Associated Wholesale Grocers, Inc.* rejected the argument that the failure to comply with the requirement that the carrier execute a power of attorney is only a minor or technical irregularity that should not be used to deem the tariff ineffectively filed. 989 F.2d at 284; *see Security Services, Inc. v. Kmart Corp.*, —— U.S. at ——, 114 S.Ct. at 1709–10 (refusing to apply "technical defect" rule).

Accordingly, the petition for review is denied.