BEEZER, Circuit Judge:
 

 We consider two questions. First, we examine whether in a suit brought on behalf of a bankrupt common carrier for recovery Of the carrier’s filed rate, the district court must refer the issue of the reasonableness of the filed rate to the Interstate Commerce Commission for an initial determination. Although we have addressed this question before, we revisit it in light of the Supreme Court’s decision in
 
 Reiter v. Cooper,
 
 — U.S. -, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). Second, we address contract of carriage questions.
 

 The district court granted summary judgment for Freight Distribution Service, Inc. (“FDSI”) on the grounds that Circle C Trucking’s filed rates were unreasonable. We have jurisdiction pursuant to 28 U.S.C. § 1291. Because we conclude that the district court should not have determined the reasonableness of the filed rate, and because we are unable to decide as a matter of law that the carrier provided contract carriage to the shipper, we reverse summary judgment and remand for further proceedings.
 

 I
 

 Circle C Trucking (“Circle C”) operated in interstate commerce pursuant to a grant of authority issued by the Interstate Commerce Commission (“ICC”) to provide both common carriage and contract carriage. FDSI, a California transportation brokerage company, entered into a contract with Circle C on August 2, 1988, under which Circle C agreed to transport freight tendered to it by FDSI. FDSI paid Circle C the negotiated contract rate, which was lower than Circle C’s filed tariff rate.
 

 Circle C later was declared bankrupt, and the trustee in bankruptcy, John Hargrave, filed an “undercharge” action against FDSI in the district court to recover the difference between the negotiated contract rate and the filed tariff rate, a total of $49,475.15.
 
 [1]
 
 FDSI
 
 *1021
 
 moved for summary judgment on the grounds that Circle C was acting under its authority as a contract carrier, and alternatively, that Circle C’s filed tariff rate was unreasonable.
 

 The district court granted summary judgment, concluding that the Supreme Court’s decision in
 
 Reiter
 
 had undermined the fixed rate doctrine, and that the very fact that the parties intentionally entered into a negotiated contract for a rate lower than the filed tariff indicated that FDSI’s “claims of unreasonableness are justified.”
 

 We review
 
 de novo
 
 the district court’s grant of summary judgment.
 
 Jesinger v. Nevada Fed. Credit Union,
 
 24 F.3d 1127, 1130 (9th Cir.1994). Summary judgment is appropriate if the “pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c).
 

 II
 

 Hargrave argues that the district court should have referred the issue of the filed rate’s reasonableness to the ICC for an initial determination. We agree.
 

 In
 
 Milne Truck Lines, Inc. v. Makita U.S.A., Inc.,
 
 970 F.2d 564 (9th Cir.1992), we recognized that the “issue of reasonableness requires ‘preliminary resort to the [ICC].’”
 
 Id.
 
 at 569 (quoting
 
 Great N. Ry. v. Merchants Elevator Co.,
 
 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922)). We later stated that “[t]he ICC has exclusive primary jurisdiction to determine the reasonableness of a filed rate.”
 
 RTC Transp., Inc. v. Conagra Poultry Co.,
 
 971 F.2d 368, 372 (9th Cir.1992);
 
 see also Union Pac. R.R. v. Bay Area Shippers Consolidating Ass’n,
 
 594 F.2d 1291, 1294 (9th Cir.1979).
 

 The Supreme Court, in 1993, decided
 
 Reiter v. Cooper,
 
 — U.S.-, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). In that case, the trustee of a bankrupt carrier sought to collect the difference between a negotiated rate and a filed rate. The shipper attempted to raise a defense to the “undercharge” action based on the unreasonableness of the rate. The Court held that the shipper could raise the claim of unreasonableness in the district court as a counterclaim.
 
 Id.
 
 at -, 113 S.Ct. at 1217. When the carrier is in bankruptcy, the equities will generally favor resolution of the undercharge claim and the unreasonableness claim in the same judgment.
 
 Id.
 
 at-, 113 S.Ct. at 1221.
 

 We need not address all the implications of
 
 Reiter
 
 on our decisions in
 
 Milne
 
 and
 
 Conagra.
 
 Certainly, our holding in
 
 Milne
 
 that a shipper could plead unreasonableness of the filed rate as a defense is modified by
 
 Reiter’s
 
 holding that a shipper can raise the issue only as a counterclaim. What
 
 Reiter
 
 does not do, however, is alter the principles that a common carrier must charge its filed rate, and that the determination of a filed rate’s reasonableness is a matter properly within the jurisdiction of the ICC.
 

 Indeed, the Court in
 
 Reiter
 
 framed the issue as whether, when a shipper raises a claim of unreasonableness, the district court should proceed to judgment “without waiting for the [ICC] to rule on the reasonableness issue.”
 
 Id.
 
 at-, 113 S.Ct. at 1216. Thus, the issue was not
 
 if
 
 the ICC was the proper forum in which to decide the reasonableness question, but
 
 when
 
 the issue should be determined. If the equities favored a separate judgment, usually when the carrier was solvent, the carrier should prevail on the undercharge claim and the shipper had the option to recoup its losses by seeking reparations before the ICC. In the context of a bankrupt carrier, however, the Court observed that the ordinary procedure would be for the district court to “refer” the question to the ICC, staying further proceedings on the undercharge claim. Either way, the ICC is the only forum for arguing that a filed rate is unreasonable.
 

 We conclude that
 
 Reiter
 
 has not altered our holdings that the ICC has primary jurisdiction to determine the reasonableness of a filed rate.
 
 See Vining v. Rock Wool Mfg. Co.,
 
 989 F.2d 1424, 1433 (5th Cir.1993) (“[R]ate reasonableness is one area where uniformity and agency knowledge are essen
 
 *1022
 
 tial to a proper result.”)- The district court erred in deciding whether Circle C’s filed tariff rate was unreasonable.
 

 We also note that the district court’s conclusion that the filed rate was unreasonable was based on a flawed premise. The mere fact that a shipper and carrier enter into a contract at a rate lower than the filed rate does not, in itself, indicate that the filed rate is unreasonable. That logic would undermine the fixed rate doctrine, and it is certainly not mandated by any statute or decision.
 
 Reiter
 
 did not disturb the Supreme Court’s holding in
 
 Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,
 
 497 U.S. 116, 127-31, 110 S.Ct. 2759, 2766-68, 111 L.Ed.2d 94 (1990), that a common carrier could not provide services for negotiated contract rates lower than the carrier’s filed tariff rates.
 

 Ill
 

 FDSI next argues that we can affirm summary judgment on a different ground, namely that Circle C was operating under its contract carriage authority when it transported freight for FDSI. Because a contract carrier is not required to adhere to a filed rate and because the negotiated contract rate is not subject to a requirement of reasonableness, further analysis would be unnecessary. We conclude that there are genuine issues of material fact regarding whether Circle C was operating in its contract carrier capacity; thus, we decline FDSI’s invitation to affirm on this basis.
 

 FDSI initially argues that the district court resolved this issue in its favor. In other words, the district court agreed with FDSI that Circle C was providing contract carriage. We disagree. The district court’s decision indicates the exact opposite conclusion, that the court either assumed or decided that Circle C was providing common carriage. There is no other explanation for the court’s addressing the reasonableness of the filed rate and the continuing vitality of the fixed rate doctrine. Although we cannot agree with FDSI that the district court concluded that the contract between the parties met the requirements for contract carriage, we will consider whether the court’s decision can be affirmed on that basis.
 
 See United States v. Washington,
 
 969 F.2d 752, 755 (9th Cir.1992),
 
 cert. denied,
 
 — U.S. -, 113 S.Ct. 1945, 123 L.Ed.2d 651 (1993) (we can affirm the district court on any basis supported by the record, even if the district court did not rely on that basis).
 

 A motor common carrier is a “person holding itself out to the general public to provide motor vehicle transportation for compensation over regular or irregular routes, or both.” 49 U.S.C. § 10102(14);
 
 Conagra,
 
 971 F.2d at 370. A motor contract carrier, by contrast, provides motor vehicle transportation of property for compensation under continuing agreements with one or more persons either “by assigning motor vehicles for a continuing period of time for the exclusive use of’ the shipper or by designing the agreements to “meet the distinct needs of [the shipper].” 49 U.S.C. § 10102(15)(B);
 
 Conagra,
 
 971 F.2d at 370.
 

 A motor common carrier must file with the ICC public tariffs containing its rates and charges.
 
 Maislin,
 
 497 U.S. at 120, 110 S.Ct. at 2762; 49 U.S.C. § 10762(a)(1). The filed rate is the only rate that a common carrier may charge, and that a shipper may pay, unless that rate is “set aside by the ICC as unreasonable or unlawful.”
 
 Trans-Allied Audit Co. v. I.C.C.,
 
 33 F.3d 1024, 1028 (8th Cir.1994);
 
 see Maislin,
 
 497 U.S. at 120, 110 S.Ct. at 2762-63.
 

 A motor contract carrier, however, is exempt from the requirements of adhering to a filed tariff. 49 U.S.C. § 10761(b); 49 U.S.C. § 10762(f);
 
 Bankruptcy Estate of United Shipping Co. v. General Mills, Inc.,
 
 34 F.3d 1383, 1388 (8th Cir.1994). Motor contract carriers can “set their own rates, which can be higher or lower than common carrier rates (but usually lower).”
 
 Trans-Allied,
 
 33 F.3d at 1029. Carriers can provide common carriage or contract carriage, or both.
 
 Id.
 
 at 1027.
 

 At the time Circle C and FDSI entered into their contract, 49 C.F.R. § 1053.1 (1991) set forth basic requirements for whether a shipper (or broker) and carrier contract relationship constituted the required “continuing agreement” mandated by 49 U.S.C.
 
 *1023
 
 § 10102(15)(B).
 
 [2]
 
 These requirements included that the agreement be in writing, that it be bilateral, that it provide for transportation for a particular shipper (or broker), that it be preserved, and that it impose specific obligations upon both carrier and shipper (or broker).
 
 Trans-Allied,
 
 33 F.3d at 1031.
 

 FDSI submits as support for its position the contract between it and Circle C along with an affidavit from FDSI’s president. The contract is titled “MASTER BROKER/CONTRACT CARRIER AGREEMENT.” It obligates FDSI to offer shipments of freight to Circle C during the lifetime of the contract. FDSI’s president states in his affidavit that the contract “was drawn pursuant to C.F.R. [§ ] 1053.” The president also elaborates why he believes the contract satisfied the various requirements. Finally, the president states that the agreement met the “distinct needs” of FDSI, as required by 49 U.S.C. § 10102(15)(B)(ii).
 

 Hargrave, however, submitted an affidavit from an auditing supervisor, Rodney Jorgen-son, stating that he believed that the contract failed to meet all the statutory and regulatory requirements.
 

 The district court made no findings or conclusions on whether the contract met any or all of the statutory or regulatory requirements necessary to establish valid contract carriage. Because disputed issues of material fact exist regarding the nature of the relationship between Circle C and FDSI and the extent to which their contract met the existing requirements, summary judgment is not appropriate. Fed.R.Civ.P. 56(c).
 

 On remand, this threshold issue of whether Circle C was providing contract carriage or common carriage to FDSI should be resolved before the district court considers referral of the filed rate’s reasonableness to the ICC. The filed rate becomes relevant only if Circle C was providing common carriage.
 

 IV
 

 Hargrave argues in his reply brief that the Negotiated Rates Act of 1993, Pub.L. No. 103-180, § 8, 107 Stat. 2044, 2052 (effective Dec. 3, 1993), now provides that when a dispute arises over whether a carrier is providing transportation under its common carrier or contract carrier authority, “the Commission shall have jurisdiction to, and shall, resolve the dispute.” 49 U.S.C. § 11101(d). We leave it to the district court to consider the possible application of this statute, and to determine in light of 49 U.S.C. § 11101(d) whether it should refer the issue of contract carriage to the ICC.
 
 [3]
 

 REVERSED AND REMANDED.
 

 [1]
 

 . This type of action is not uncommon. Indeed, it has been "replicated many times in the era of 'deregulation' following enactment of the Motor Carrier Act of 1980.”
 
 Reiter,
 
 - U.S. at-, 113 S.Ct. at 1216.
 

 [2]
 

 . Effective June 20, 1992, the ICC repealed this C.F.R. section, but it was in effect at the time the contract was in force.
 
 Transrisk Corp. v. Matsushita Elec. Corp.,
 
 15 F.3d 313, 316 n. 3 (4th Cir.1994). The regulations contained in 49 C.F.R. § 1053.1 were subsequently reinstated by Congress in 1993.
 
 Trans-Allied,
 
 33 F.3d at 1031.
 

 [3]
 

 . Indeed, in order to expeditiously resolve this case, the district court may wish to consider referral to the ICC of both disputed questions: (1) whether Circle C provided transportation services as a contract or common carrier; and (2) whether, if common carriage was provided, the filed rate was unreasonable.